RECEIVED

JUL 2 5 2006

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED

AUG 10 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| LAUREN BROWNING, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CAUSE NO. SA-05-CA-0245-FB |
| | § | |
| SOUTHWEST RESEARCH INSTITUTE | § | |
| Defendant. | § | |

## DEFENDANT SOUTHWEST RESEARCH INSTITUTE'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Defendant, Southwest Research Institute (hereinafter "SwRI," "Institute," or "Defendant"), and files this its Motion for Summary Judgment, and in support thereof would respectfully show the Court as follows:

## I.  BACKGROUND

On or about March 29, 2005, Plaintiff Lauren Browning (hereinafter "Plaintiff" or "Browning") filed this action against Defendant Southwest Research Institute asserting violations of the Equal Pay Act and Title VII. Plaintiff claims that she received unequal pay as compared to her male co-workers at the Institute, was not promoted, and that she was retaliated against based on her complaints regarding unequal pay. Plaintiff cannot establish a prima facie case of violations of either the Equal Pay Act or Title VII by Defendant. Moreover, even assuming for the sake of argument that Plaintiff could establish her prima facie case, Defendant has (a) established that one or more of the exemptions, affirmative defenses, to the Equal Pay Act apply as a matter of law, and (b) articulated legitimate non-discriminatory reasons for its actions which Plaintiff has failed to establish as a pretext under Title VII. Furthermore, Plaintiff cannot establish that she was retaliated against based on any alleged complaints of unequal pay

31162532.1

- 1 -

or promotion.  Plaintiff's inability to establish one or more of the necessary elements of any of the above causes of action entitles Defendant to summary judgment as a matter of law.

Finally, as discussed in greater detail at *Section IV.A., page 12.*  Plaintiff's claim for constructive discharge is, factually and legally, without merit and wholly unsupported under Fifth Circuit precedent.  Under no theory can Plaintiff establish that her working conditions were so intolerable that a reasonable person would have felt compelled to resign.  Rather, at the time Plaintiff voluntarily quit her job she had *never* been demoted or threatened with demotion, *never* been suspended or threatened with suspension, *never* been counseled that failure to correct a particular job related behavior would result in termination, *never* had a salary reduction or threatened with salary reduction, *never* failed to receive an annual salary increase, *never* been rated below the overall "meets expectation" performance evaluation category, *never* been reassigned to menial or degrading work, *never* been badgered, harassed or humiliated by the Institute, never had her supervisors or coworkers encourage her to leave, and *never* been offered continued employment on terms or conditioned upon terms less favorable than her former status.  Indeed, and specifically to the contrary, (a) just *four months* before she voluntarily quit Plaintiff received her annual performance evaluation ranking her within the "meets expectations" category range, (b) just *two months* before quitting Plaintiff received a nearly $2,000 or 3.5% salary increase, (c) just *weeks* before quitting Plaintiff had met one on one with her immediate supervisor who discussed and encouraged Plaintiff in her job performance, and (d) maintained good personal relationships with several of her co-workers.  Under these facts it is indisputable that Plaintiff was not, and never was, the subject of intolerable working conditions forcing her resignation.  Plaintiff's wholesale failure to meet the necessary elements for constructive discharge, entitles Defendant to summary judgment as a matter of law.

## II.   SUMMARY JUDGMENT STANDARD OF LAW

Summary judgment is appropriate, and movant is entitled to summary judgment as a matter of law, when movant demonstrates from the pleadings, affidavits and other evidence before the Court, that no genuine issue of material fact exists. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Rule 56(c) "mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322-23; *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

To avoid summary judgment, the nonmovant must proffer competent summary judgment evidence. "Mere conclusory allegations" are "insufficient to defeat... a motion for summary judgment." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(e); *Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995). Through competent evidence, the nonmovant must produce specific facts showing that there remains a genuine issue for trial. *See Garcia v. Elf Atochem N. Am.*, 28 F.3d 446, 447 (5th Cir. 1994). As demonstrated herein, Plaintiff cannot establish that a genuine issue of material fact remains in her claims against Defendant.

## III.   STATEMENT OF RELEVANT FACTS

The Institute is a non-profit institution that conducts broad based scientific and engineering research, development, analysis, and exploration across a multitude of disciplines, including, but not limited to, engine and vehicle research, aerospace, electronics, information technology, applied physics, automotive products and emissions, automation and data systems, chemistry and chemical engineering, geosciences, mechanical engineering, material sciences and space and planetary sciences. The Institute is organized into divisions with each division

handling a distinct area of research or analysis.  Division 20, the Center for Nuclear Waste Regulatory Analyses ("CNWRA"), and the division in which Plaintiff worked, was at the time of Plaintiff's employment devoted nearly 100% to projects sponsored by the U.S. Nuclear Regulatory Commission.  *See* **Exhibit A**, Affidavit of Dr. Wes Patrick.

Browning was hired by the Institute on or about December 7, 1998.  The Institute initially offered Plaintiff a limited-term, one-year contract position as a research scientist with Division 20 at a salary of approximately $42,000, which was clearly within the $35-48,000 salary range Browning indicated that she would accept on her application for this position.  *See* **Exhibit B**, Deposition of Dr. Pearcy at 47, **Exhibit C**, Plaintiff's Employment Application. Plaintiff nonetheless rejected this offer and asked for more money in the range of $65,000 to $70,000.  This figure was substantially more than the $38,000 salary Plaintiff represented she was earning at her then current position with the University of Hawaii.  **Exhibit C,** Plaintiff's Employment Application.  At Plaintiff's request Defendant revised its offer to $45,000, which Plaintiff accepted.  This salary, again, was not only within the range Browning indicated as acceptable on her employment application but, in fact, at the high end of Plaintiff's requested salary.  **Exhibit C,** Plaintiff's Employment Application; **Exhibit D**, Plaintiff's Deposition at 87; **Exhibit B**, Deposition of Dr. Pearcy at 47.

The individuals primarily responsible for Plaintiff's interview, selection and initial hire into Division 20 in 1998 were Dr. English Pearcy (Plaintiff's immediate supervisor for the entirety of Plaintiff's employment, and Manager of the Geochemistry and Geohydrology element within Division 20), Dr. Budhi Sagar (Technical Director for Division 20 and the individual to whom Dr. Pearcy reported), and Dr. Wes Patrick (then President of the CNWRA, currently Vice

President of Division 20 and the individual to whom Drs. Pearcy and Sagar reported). **Exhibit A,** Affidavit of Dr. Wes Patrick at ¶ 9.

Despite, and indeed contrary to her allegations of sex discrimination, Plaintiff enjoyed a multitude of events and beneficial personnel actions at the direction of Drs. Pearcy, Sagar and Patrick (the "same actors" of whom she now complains) that clearly evidence *anything but* sex discrimination. For example, in December 1999, one year after being selected for hire by these individuals as a limited, one-year term employee, these same individuals, Drs. Patrick, Sagar and Pearcy, elected in effect to rehire Plaintiff by extending Plaintiff's limited term contract for another year. **Exhibit A,** Affidavit of Dr. Wes Patrick at ¶ 9. Thereafter, on or about October 6, 2000, with input and agreement from Drs. Pearcy and Sagar, Dr. Patrick prepared a written recommendation that Plaintiff be hired by the Institute as a regular employee. **Exhibit E,** Personnel Recommendation of Browning by Wes Patrick. This action was, in effect, a *third* hiring decision by the same actors that Plaintiff now accuses of sex discrimination. Not likely.

Still further, in each and every year following Plaintiff's initial hire in December 1998, Plaintiff has enjoyed, at the recommendation and/or approval of Drs. Pearcy, Sagar and Patrick, significant salary increases, averaging an annual raise of 5.5%.

| Date | Salary | Increase | Percent |
|------|--------|----------|---------|
| 12/07/98[1] | $45,000 | -- | -- |
| 03/11/00 | $47,000 | $2,000 | 4.44% |
| 03/17/01 | $51,039 | $4,039 | 8.59% |
| 03/16/02 | $54,611 | $3,572 | 6.99% |
| 03/15/03 | $56,795 | $2,184 | 3.99% |
| 03/13/04 | $58,783 | $1,988 | 3.50% |
| 05/21/04[2] | $58,783 | -- | -- |

---

[1] Plaintiff's date of hire with Southwest Research Institute.

[2] Plaintiff's date of voluntary resignation from Southwest Research Institute.

*See* **Exhibit F**, SwRI Employee Salary Information and History Report.  Key to each of these salary decisions was the input of the "same actors" Drs. Pearcy, Sagar and Patrick.  **Exhibit A,** Affidavit of Dr. Wes Patrick at ¶ 9.

In addition to Plaintiff's regular salary increases, and further evidencing the absence of any manner of alleged discrimination, every single year of her employment Plaintiff received positive and favorable annual performance appraisals of her technical work.  While Plaintiff's evaluations had declined from the category of exceeds expectations to meets expectations in January 2003, 1½ years before she quit, *at no time* was Plaintiff's employment ever in jeopardy, nor was Plaintiff ever disciplined or reprimanded for conduct leading to suspension or separation from employment.  To the contrary, the evaluation of Plaintiff's work by Drs. Pearcy, Sagar and Patrick was mostly positive and encouraging, and *never falling below the "Meets Expectations"* overall evaluation category.[3]  For example:

| Date | Overall Evaluation | Sample Comments |
|---|---|---|
| 08/23/99 | Exceeds Expectations | Supervisors Comments:<br>- She has effectively become the resident expert at using the GEM module of MULTIFLO;<br>- She has contributed significantly to Div. 15 Hypervelocity Impact project;<br>- She has developed productive collaborations and has demonstrated a willingness to undertake a wide variety of tasking. |

---

[3] Division 20 evaluates employees based on the performance categories of clearly outstanding, exceeds expectations, meets expectations, needs improvement and unsatisfactory.  Within these categories an employee may receive a + or – to denote slight variations within the overall ranking or category.  **Exhibit A,**  Affidavit of Dr. Wes Patrick, at ¶ 8; **Exhibit G,** Salary Administration Program, p. 8.  At the time Plaintiff quit her job, Plaintiff's last performance ranking was that of meets expectation (-), which was the same ranking she had held since January 2003 (or *10 months before* Plaintiff's self described November 2003 "Earliest Act of Discrimination").  **Exhibit H,** Plaintiff's EEOC Charge of Discrimination.  Moreover, during her employment Plaintiff was never ranked in either the "needs improvement" or "unsatisfactory" overall performance categories.

| | | Plaintiff's Comments:<br>- I have an excellent job.<br>- Management provides me information and support in a forthright and responsible fashion. |
|---|---|---|
| 02/09/00 | Exceeds Expectations | Supervisors Comments:<br>- Dr. Browning has become an important member of our team;<br>- She has effectively become the resident expert at using the GEM module of MULTIFLO;<br>- She has actively published and presented her work.<br><br>Plaintiff's Comments:<br>- I have an excellent job.<br>- Management provides me information and support.<br>- Want to thank English Pearcy for providing to me much needed encouragement during more troubled times. |
| 02/01/01 | Exceeds Expectations | Supervisors Comments:<br>- She has made strong contributions to the ENFE KTI;<br>- Provided exceptional support to the ENFE NRC/DOE technical exchange;<br>- NRC has commended her success<br>- Led a successful effort to evaluate and document CNWRA usage and needs for UNIX computing resources;<br>- Demonstrated considerable skill and patience handling sometimes contentious personalities<br><br>Plaintiff's Comments:[4]<br>- I have an excellent job.<br>- I appreciate the perspective and words of encouragement that English Pearcy provides me. |

---

[4] In Plaintiff's self evaluation, Plaintiff requests promotion to Senior Research Scientist.  **Exhibit O,** Plaintiff Self Evaluation 2001, at SwRI 710.  Therein, Plaintiff does ***not*** contend that her job rank or failure to promote is gender based.

| 01/29/02 | Exceeds Expectations (-) | Supervisors Comments:<br>- continued to lead the Integrated Subissue on Quantity and Chemistry of Water Contacting the Waste Package and Waste Form;<br>- continues to serve as CNWRA lead for reactive transport modeling for ENFE<br>- makes time to consult with numerous internal groups that seek her chemistry and mineralogy input for projects;<br>- demonstrated considerable business development initiative with contributions to half dozen efforts as well as development of promotional literature;<br>- Should strive to cultivate a positive "can do" attitude.<br>- Should refrain from making gratuitous, negative comments about colleagues.<br>- Should avoid discussing internal matters with clients.<br>Plaintiff's Comments:<br>- I feel that I am under compensated for the nature and extent of [my work] relative to my peers.[5]<br>- I ask that you please consider this anew, and find a protocol to make the appropriate salary and status adjustments. |
| 01/29/03 | Meets Expectations (-) | Supervisors Comments:<br>- Considerable effort to co-editing a special volume of Computers & Geosciences and co-authoring a paper for that volume;<br>- Active in Mars project  and opportunities to collaborate;<br>- General attitude was markedly improved during this period<br>- Should continue to develop and |

---

[5] In Plaintiff's self evaluation, Plaintiff identifies 3 males and 2 females amongst her peer group.  **Exhibit P,** Plaintiff Self Evaluation 2002, at SwRI 722

| | | |
|---|---|---|
| | | sustain a positive attitude.<br>- Should follow management directions and Institute procedures at all times.<br>- Made unauthorized business trip, and her time card was not completed accurately.<br>- Initially quite reluctant to participate [in Mars project].<br><u>Plaintiff's Comments:</u><br>Please support my promotion to the appropriate technical position. |
| 01/29/04 | Meets Expectations (-) | <u>Supervisors Comments:</u><br>-Named co-chair for the Materials Research  Society spring 2004 meeting;<br>- Much time spent reviewing papers for presentations;<br>- Contributed to development of improved chemistry module;<br>- Provided chemistry input to multi-KTI experiments;<br>- Work on technical review of the DOE TBDoc has been commended by the NRC technical leader;<br>- Has at times made business travel arrangements herself bypassing Institute procedures;<br>- Technical reviews have lacked adequate technical rigor;<br>- Attitude and approach to work have improved but require sustained attention to assure positive and professional interactions.<br><u>Plaintiff's Comments:</u><br>This has been an exceptional year for me.<br>I interact very well with NRC and worked productively with staff from most KTI's demonstrating versatility to serve as leader mentor and team player. |

*See* **Exhibits I, J, K, L, M and N**, Plaintiff's 1999-2004 Performance Evaluations.

Despite the fact that Browning had discussions with Division 20 personnel about wanting a larger salary, Browning *never* complained that she was being paid unequal to males performing similar work. Prior to her 2001 evaluation, Browning met with Dr. Pearcy to discuss her salary level. At this meeting, Browning provided Dr. Pearcy with written information about national salary surveys and a graph that she had prepared calculating her salary forward, comparing it with imaginary employees at a fixed salary. *See* **Exhibit D**, Plaintiff's Deposition at 120. In addition, sometime in 2003, Plaintiff, together with male co-workers, Michael Smith and Randall Fedors, as members of the Division 20 management advisory committee ("DMAC") group to which they belonged, met with Tony Magaro in SwRI's human resources department to obtain information for the DMAC about how salaries and ranks were determined at the Institute. *See* **Exhibit D**, Plaintiff's Deposition at 121-24. There is no evidence that Plaintiff complained of unequal pay relative to her co-workers, male or female, at this meeting. Rather, both the DMAC member interest in salary information and the meeting with Mr. Magaro requesting information was entirely gender neutral. *See* **Exhibit D**, Plaintiff's Deposition at 127-29, 136-37 (*Q:* "It was not, as I understand it, a directive that was in any way related to sex discrimination allegations as to wages or salary or rank; is that correct?. *A:* **"I don't recall that having been raised."** *Id.* )

As early as January 2001, Plaintiff expressed dissatisfaction with her Research Scientist level and requested promotion. Therein, Plaintiff does *not* however contend that her rank or failure to promote was gender based **Exhibit O,** Plaintiff Self Evaluation 2001, at SwRI 710. Concurrently, Plaintiff also expressed satisfaction with her job and speaks highly of English Pearcy as her supervisor. **Exhibit K.** Plaintiff's 2001 Performance Evaluation. In her January 2002 performance evaluation, Browning once again requests advancement from her

Research Scientist position to Senior Research Scientists stating, "I ask that you please consider this anew and find a protocol to make the appropriate salary and status adjustments."[6] Browning requested this promotion *despite* her unequivocal knowledge of, and failure to satisfy, Division 20's requirement for two consecutive "clearly outstanding" performance evaluations before an employee could be considered for advancement to the next career ladder step. See **Exhibit D**, Plaintiff's Deposition at 118-21; **Exhibit L**, January 2002 Performance Evaluation; **Exhibit Q**, Deposition of Dr. Patrick at 79, 125-26; **Exhibit S**, Budhi Sagar Memorandum; and **Exhibit A**, Affidavit of Dr. Wes Patrick. Browning was essentially asking the Institute to waive this requirement **just for her** and "do whatever they needed to do to give [her] the appropriate salary and status adjustments." See **Exhibit D**, Plaintiff's Deposition at 118-19. Specifically, Plaintiff testified as follows:

> *Q:*   Are you aware of any other employee at the Institute who has had a different protocol than the two successive clearly outstanding rankings applied to them?
>
> *A:*   *No.*
>
> *Q:*   But you are asking for establishment of a protocol outside of that to be applicable to you:
>
> *A:*   *Yes.*

*Id.* Plaintiff's concept of nondiscriminatory treatment for *all* employees is a bit skewed.

On or about May 10, 2004, Plaintiff gave notice to SwRI that she was quitting her job effective May 21, 2004. Plaintiff provided no reason for quitting, she simply quit. **Exhibit R.** Resignation letter from Plaintiff. On September 3, 2004, Browning filed a charge of gender discrimination with the EEOC. Browning was represented by highly qualified legal counsel at

---

[6] Plaintiff's use of the phrase "consider this anew" confirms Plaintiff's request for a higher job title *prior to 2002*. Plaintiff's request for promotion was not new in 2002, 2003 or 2004 and, having no temporal proximity to Plaintiff's complaints, can not serve as a basis for the alleged acts of retaliation *or* constructive discharge.

the time she filed the EEOC charge.   On the charge, Browning checked the box for

discrimination based on "sex" and "other (Equal Pay Act)" box and identified the "Earliest Date

Discrimination Took Place" as November 3, 2003, and the "Latest Date Discrimination Took

Place" as May 21, 2004, the date of her voluntary resignation.  Plaintiff failed to check either the

"retaliation" box or the "continuing violation" box on the charge.  **Exhibit H**, EEOC Charge of

Discrimination.

### IV.   ARGUMENT AND AUTHORITIES

**A.**   **Plaintiff Cannot Establish Under Any Stretch of the Imagination, and Certainly Not Under the Requirements of the Fifth Circuit and the United States Supreme Court That She Was Constructively Discharged From Employment at SwRI.**

   **1.**   **Plaintiff absolutely cannot establish intolerable working conditions to support constructive discharge under Fifth Circuit law.**

Plaintiff cannot establish that she was constructively discharged by discriminatory

treatment or in retaliation for any alleged complaint regarding unequal pay or failure to promote.

Resignation is actionable under Title VII only if the resignation qualifies as a constructive

discharge.  *See Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001); *see also*

*Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 439 (5th Cir. 2005) (recognizing

that a claim of retaliation may be based on constructive discharge).  To establish a constructive

discharge, the plaintiff must demonstrate that the "working conditions were so intolerable that a

reasonable employee would feel compelled to resign."  *Brown*, 237 F.3d at 566; *see also*

*Mowbray v. Am. Gen. Life. Cos.*, 162 F. App'x. 369, 375 (5th Cir. 2006), *cert. denied*, 2006 U.S.

LEXIS 5211 (June 30, 2006) (affirming summary judgment for the employer where the plaintiff

presented no evidence establishing constructive discharge), **Exhibit GG.**

The Fifth Circuit has used seven factors in determining whether a reasonable employee

would feel compelled to resign: (1) demotion; (2) reduction in salary; (3) reduction in job

responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by an employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown*, 237 F.3d at 566; *Denman v. Tex. Dep't of Licensing & Regulation*, No. SA-04-CA-0620-RF, 2006 U.S. Dist LEXIS 8094, at *13 (W.D. Tex. Jan. 19, 2006). Moreover, a claim of constructive discharge requires a ***"greater severity or pervasiveness of harassment"*** than is necessary to establish a claim for hostile work environment. *Harvill*, 433 F.3d at 440 (quoting *Landgraf v. USI Film Products*, 968 F.2d 427, 429-30 (5th Cir. 1992). Under this standard, discrimination, without the "aggravating factors," is legally insufficient to establish a claim for constructive discharge. *Harvill*, 433 F.3d at 440; *Brown*, 237 F.3d at 566.

Actions occurring more than two years prior to an employee's resignation cannot support a claim for constructive discharge. *Reznick v. Associated Orthopedics & Sports Medicine, P.A.*, 104 F. App'x 387, 393 (5th Cir. 2004) (unpublished), **Exhibit HH.**. In addition, the disparate treatment of employees alone does not constitute constructive discharge. *Brown*, 237 F.3d at 566. Likewise, a neutrally-applied, across the board policy does not constitute hostility or harassment. *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 343 (5th Cir. 2005) (holding that an across the board policy of requiring salesman to work from the office did not constitute hostility or harassment); *Jurgens v. EEOC*, 903 F.2d 386, 390 (5th Cir. 1990) (holding that a blanket, racially neutral reorganization which resulted in the demotion of white employees was not sufficient to support a claim for constructive discharge). Furthermore, a reasonable employee would not necessarily feel compelled to resign where the employee has options other than resigning. *See Boze v. Branstetter*, 912 F.2d 801, 805-06 (5th Cir. 1990) (affirming

summary judgment for the employer where the plaintiff had options other than resigning, such as pursuing an internal grievance process).

Fifth Circuit case law supporting Defendant SwRI's position in this regard is extensive. The Fifth Circuit has affirmed summary judgment for the employer even where the plaintiff was demoted and had his job responsibilities reduced, see *Brown v. Bunge Corp.*, 207 F.3d 776, 782-83 (5th Cir. 2000), where the plaintiff had been publicly ridiculed, *see McKethan v. Tex. Farm Bureau*, 996 F.2d 734, 741 (5th Cir. 1993), and where the employee had options other than resigning, *see Boze*, 912 F.2d at 805-06. In *Mowbray*, the Fifth Circuit affirmed a grant of summary judgment for the employer on the plaintiff's constructive discharge claim where the plaintiff presented no evidence establishing a genuine issue of material fact on the aggravating factors and where it was undisputed that she did not suffer a decrease in salary, change in title, or demotion. 162 F. App'x. at 374-75. In fact, the court found that the record offered no evidence of any of the aggravating factors. The court also noted that the plaintiff had three options other than resigning and that a reasonable employee faced with these options would not have felt compelled to resign. *Id.* at 375.

Still further, in *Harvill*, the Fifth Circuit affirmed summary judgment for an employer on a Title VII retaliation claim where the employee did not allege any aggravating factors rendering the harassment so intolerable that a reasonable employee would feel compelled to resign. 433 F.3d at 440. The court noted that the plaintiff had attempted to support her claim of constructive discharge by submitting an affidavit asserting that she was "treated rudely and with general hatefulness" by other supervisors and employees, that an unknown man began taking pictures of her, that a racial harassment charge was brought against her without merit, and that a supervisor stated he would receive a bonus for running her off. The court found that the plaintiff had

presented no evidence of constructive discharge other than these conclusory allegations and that, even accepting these allegations as true, the plaintiff had not presented any evidence of aggravating factors that would render the alleged harassment so intolerable that a reasonable person would have felt compelled to resign. *Id.*

Similarly, in *Denman*, Judge Furgeson of the Western District of Texas upheld summary judgment for the employer where the employee failed to set forth sufficient evidence of any of the "aggravating factors" recognized by the Fifth Circuit. 2006 U.S. Dist. LEXIS 8094 at *14. The plaintiff had argued that her transfer to a new department was instead a demotion. The court found, in part, that the employee suffered no reduction in pay, that the employee was performing the same type of tasks, and that there was no sufficient evidence of a reduction in job responsibilities. Nor was there any sufficient evidence to support the remaining factors. Thus, the court held that the plaintiff had failed to create a genuine issue of material fact on one or more of the required elements of her constructive discharge claim and that her resignation was not an adverse employment action. *Id.* at *15.

Finally, in *Reznick*, a female doctor brought suit against her former employer alleging violations of the Equal Pay Act and sex discrimination under Title VII. 104 F. App'x at 388. The employer initially offered the doctor, Reznick, nearly the same three year employment contract that it had offered to a male doctor the year prior to Reznick's offer. Reznick rejected this offer and submitted a counteroffer that included an increase in base salary and a maternity leave clause. The employer accepted Reznick's counteroffer. Shortly after beginning her employment, Reznick's supervisor allegedly made several sexist comments to Reznick. In addition, the employer hired another doctor, male, nearly a year after hiring Reznick at a

substantially increased salary.  After an incident involving a request by her supervisor to treat one of his patients, Reznick submitted her resignation.

In her suit, Reznick argued that her employer violated the Equal Pay Act by paying the other doctor a substantially hired salary despite the fact that he held an identical position and that they performed similar duties.  Reznick also argued that she was constructively discharged as a result of her employer's sexist behavior and sex-based discrimination violating Title VII.  *Id.* at 390.  After holding that Reznick could not establish a prima facie case under the Equal Pay Act, the Fifth Circuit considered whether she suffered an adverse employment action, that is, whether she was constructively discharged.  In support of her claim, Reznick offered nineteen different facts which she claimed established that she had been constructively discharged.  The court, however, found that she had not experienced a demotion or reduction in job salary or responsibilities.  The court noted that a failure to promote is "by definition" not a demotion.  Nor did the evidence demonstrate that Reznick was assigned either degrading work or a younger supervisor or offered early retirement.  Therefore, the only issue was whether she had been badgered, harassed or humiliated into resignation by her employer.  On this issue, the court noted that thirteen of the facts that Reznick alleged occurred two to three years before her resignation and could not support her claim for constructive discharge.  *Id.* at 393.  Further, the court found that the remainder of Reznick's facts dealt with more favorable treatment of the other doctor compared to Reznick.  The disparate treatment could not, however, constitute constructive discharge.  Since Reznick was unable to establish her prima facie case, the court affirmed the district court's grant of summary judgment for the employer.  *Id.*

2.     **Plaintiff Browning was never subjected to intolerable conditions at SwRI and suffered no aggravating factors necessary to constructive discharge.**

Here, Plaintiff cannot establish the presence of any aggravating factors that would render her employment so intolerable that a reasonable person would have felt compelled to resign. Plaintiff has not alleged that she was demoted, reassigned to menial or degrading work, reassigned to work under a younger supervisor, or offered of early retirement or continued employment on terms less favorable than her former status, or that she suffered a reduction in salary. Likewise, at no time was Plaintiff ever threatened with such action of any sort.

Furthermore, as noted above, Plaintiff began complaining about her salary even before she decided to accept the Institute's offer of employment. This dissatisfaction continued, nearly unabated, until her decision to quit her job at the Institute. Similarly, Plaintiff expressed her dissatisfaction with her research scientist level position from January 2001 up to the time she quit. As discussed above, any action occurring more than two years prior to her resignation cannot support her claim of constructive discharge. Plaintiff's complaints regarding salary and promotion existed well before this two year mark.

In addition, Plaintiff admitted that there was no precipitating event that triggered her resignation. *See* **Exhibit D**, Plaintiff's Deposition at 207. Moreover, while Plaintiff has alleged that her credibility was undermined and that her lead duties were reassigned, these conclusory allegation are insufficient to establish that her working conditions that were so intolerable that a reasonable employee would feel compelled to resign. Plaintiff, in fact, admitted that she was aware of other employees, both men and women, being moved into and out of their lead

positions. *See* **Exhibit D**, Plaintiff's Deposition at 226-27. This action was not, then, hostility or harassment but a neutrally-applied policy to rotate the lead positions as needed.[7]

Moreover, contrary to her allegations, Plaintiff's ongoing personal relationships with several of her co-workers were unaffected by her removal from her lead duties. *See* **Exhibit D**, Plaintiff's Deposition at 139-49. Plaintiff testified that she continued to socialize with several Institute employees since she quit, including Winterle, Painter, Cragnolino, Manepally, and Farrell. Plaintiff also admitted that no one ever told her that they thought lesser of her because of her rank or any other reason. *See* **Exhibit D**, Plaintiff's Deposition at 220-21. The following passage is instructive on the baseless nature of Plaintiff's claim:

> *Q:*    What facts, if any, do you rely upon to support your claim that your work and/or credibility with peers was in some way undermined?
>
> *A:*    ***I think that people were aware of the fact that I had a low rank and that gave them a falsely negative impression of my contributions to the program. I think that my contributions to the program were overlooked or given short shift during the management meeting minutes and in other venues. I think that opportunities to further my career, which would have been most appropriately give to me, were given to others.***
>
> *Q:*    Did anyone ever tell you they thought lesser of you because of your rank?
>
> *A:*    ***No.***
>
> *Q:*    Did you ever see any documents that passed between other parties that indicated they thought less of you because of your rank?
>
> *A:*    ***I don't have any such documents.***
>
> *Q:*    So your statements are based on your own speculation of what other people thought, not anything anybody ever spoke to you directly; correct?

---

[7] From Plaintiff's deposition: *Q:* So Ron Green was removed and Debra Hughson replaced him? *A:* I don't know if removed doesn't – that may not be a very accurate word…And Debra Hughson took up that leadership position." *Id.* The Debra Hughson to whom Plaintiff refers is female, at one time in the Geochemistry department under English Pearcy, and held the position of Senior Research Scientist.

> A:      *I suppose.*

*Id.*   Plaintiff's speculative, self-serving and personal assumptions are insufficient to defeat summary judgment.

Plaintiff's claim of constructive discharge is further undermined by the fact that Plaintiff's annual performance evaluations always ranked her at or above the "meets expectations" overall category. *See* **Exhibits I through N.**  In fact, just four months before she quit, Plaintiff was rated as meets expectations which was the same level at which Plaintiff had been ranked the previous year, January 2003.  In short, there was ***nothing*** - no significant change or watermark event that signaled to Plaintiff an impending termination, demotion, pay cut, transfer or a need to quit.  Still further, just two months before quitting, Plaintiff received a nearly $2,000 or 3.5% salary increase.  In fact, over the course of her employment Plaintiff received salary *increases* every year – averaging 5.5% per year.  Plaintiff's wage history evidences anything but intolerable working conditions.  *See* **Exhibit F.**

Again, Plaintiff was not the subject of intolerable working conditions but, rather, a support system which provided Plaintiff positive performance evaluations, recognition of her accomplishments both in writing and via salary increases, and direct communication with the same supervisor, English Pearcy, whom Plaintiff praised on no less than three occasions in her 1999, 2000 and 2001 performance evaluations for his personal support, communication and interactions.  *See* **Exhibits I, J and K**.  Finally evidencing the ongoing efforts to work with Plaintiff, English Pearcy met with Plaintiff just weeks before she quit to discuss and encourage Plaintiff in her job performance and ability to succeed.  *See* **Exhibit B**, Pearcy Deposition, at 179-80, 187-88.

Simply, and unequivocally, Browning's claim for constructive discharge fails, entitling Defendant to summary judgment as a matter of law.

**B.     Plaintiff has Failed to Exhaust her Administrative Remedies Under Title VII Regarding her Claim of Retaliation.**

A plaintiff who fails to allege retaliation on the charge filed with the EEOC, for retaliation that occurred prior to the filing of the charge, has failed to exhaust his or her administrative remedies and is barred from bringing a subsequent civil suit on the claim. *See, e.g., Blanchet v. Chevron/Texaco Corp.*, 368 F. Supp. 2d 589, 603 (E.D. Tex. 2004); *Craven v. Tex. Dep't of Criminal Justice-Institutional Div.*, 151 F. Supp. 2d 757, 770 (N.D. Tex. 2001); *see also Perez v. MCI World Com Communications*, 154 F. Supp. 2d 932, 938 (N.D. Tex. 2001) (holding that the plaintiff failed to exhaust her administrative remedies where the plaintiff failed to check the retaliation box or include any statements regarding retaliation despite the fact that the retaliation occurred four months prior to the filing of the EEOC charge). Under Title VII, courts may not consider a claim to which the plaintiff has failed to exhaust his or her administrative remedies by filing a charge of discrimination with the EEOC. *See Taylor v. Books A Million*, 296 F.3d 376, 378-79 (5th Cir. 2002). Indeed, it has been noted that the filing of an EEOC charge is "a precondition to filing in district courts." *Id.* at 379. Thus, "[c]ivil complaints filed under Title VII may only encompass "discrimination like or related to allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the Commission." *Blanchet*, 368 F. Supp. 2d at 602 (quoting *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 711 (5th Cir. 1994)). A plaintiff may bring a claim of retaliation despite his or her the failure to check the "retaliation" box on the EEOC charge only where the claim would reasonably arise in an investigation of that charge of discrimination based on the allegations in the charge. *See, e.g., Miles v. Dell, Inc.*, 429 F.3d 480,

492 (4th Cir. 2005) (recognizing that a plaintiff must check the retaliation box and/or mention retaliation in the narrative portion of the charge in order to trigger the investigation of a charge of retaliation). However, where the "alleged retaliation occurs before the initial EEOC charge is filed, a plaintiff must exhaust her administrative remedies on that claim." *Blanchet*, 368 F. Supp. 2d at 602.

In *Blanchet*, the court held that the plaintiff's claim of retaliation was barred because she had failed to exhaust her administrative remedies. 368 F. Supp. 2d at 603. There, the plaintiff filed an initial charge with the EEOC alleging discrimination on the basis of sex dated October 1, 2003. The plaintiff later filed an amended charge alleging that she had complained to various management employees about the alleged sexual discrimination that she suffered. Then, in her amended complaint in her subsequent civil suit, filed August 17, 2004, the plaintiff, "for the first time," contended that she was retaliated against for her complaints. The court noted that neither charge filed with the EEOC asserted that the plaintiff was retaliated against despite the fact that she had been terminated some nine months previously. The court recognized that this was "not a situation where [the plaintiff] had filed her initial EEOC charge before she was terminated and was subsequently discharged as a result of pursuing her administrative remedies." *Id.* Finally, the court noted that the plaintiff had failed to check the "retaliation" box on either of the charges filed with the EEOC. Thus, the court held that the plaintiff had failed to exhaust her administrative remedies and that she could not assert a claim for retaliation as a result of this failure. *Id.*

Here, Plaintiff Browning filed her charge of discrimination on September 3, 2004. Plaintiff gave approximately two weeks notice and resigned from SwRI effective May 21, 2004. This is not a case where Plaintiff was terminated as a result of her pursuit of her administrative

remedies.  As a result, Plaintiff must exhaust her administrative remedies prior to bringing a retaliation claim.  In her charge, Plaintiff checked the "sex" and "other" boxes indicating that she was basing her claim on violations of Title VII and the Equal Pay Act.  However, Plaintiff did not check the retaliation box (despite representation by qualified legal counsel).  In her statement on the charge, Plaintiff stated that her salary was "significantly less than those of males of similar qualifications who performed similar duties" throughout her employment.  Plaintiff also stated that she was denied promotions despite similar or superior qualifications to her male co-workers.  Finally, Browning states that "[a]fter she complained several times of these issues, [she] was subjected to a hostile work environment" in that her work and credibility was undermined and her job duties were stripped.  *See* **Exhibit H**, EEOC Charge of Discrimination filed by Plaintiff.  Browning did not file any amendments to this charge.  In addition, on the Charge Questionnaire, which Browning filled out at the EEOC office, she indicated that she believed she had suffered gender discrimination but, again, did not include any allegation of retaliation.  *See* **Exhibit T**, EEOC Questionnaire for Charge of Discrimination filed by Plaintiff. As is clear, there is no mention or allegation of retaliation indicated on her charge filed with the EEOC.  Furthermore, the EEOC's investigation did not include any issues regarding retaliation, as demonstrated by the fact that the EEOC specifically requested documentation on the issues of promotions and wages, not retaliation.   *See* **Exhibit U**, EEOC Requests for Information. Because Plaintiff has failed to exhaust her administrative remedies regarding her claim of retaliation under Title VII, Defendant is entitled to summary judgment as a matter of law.

**C.    Plaintiff Never Engaged in Protected Activity Giving Rise to Protection from Retaliation.**

Engaging in protective activity and knowledge of an employee's protected activity is essential to a claim of retaliation.  Browning clearly admits in her deposition that she never told

her managers that she was complaining about salary and job title in comparison to male employees or based on gender. *See* **Exhibit D**, Plaintiff's Deposition at 212-14.   Retaliation cannot occur when the employee keeps the gender-based complaint a secret. *See, e.g.*, *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005); *Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006).   It is not reasonable to believe that Browning was lodging a gender-based complaint when she asked for more pay and a promotion because other employees – males – made similar complaints.   Moreover, Plaintiff admits that the ***one*** meeting she had with the Institute's human resources manager Tony Magaro ***was not*** a complaint or charge of sex discrimination based on wages. *See* **Exhibit D** at 121, 129, 136-37.   Similarly, Plaintiff admits that she has never, in writing or verbally, advised SwRI management that Plaintiff believed she had been discriminated against because of her gender.   Plaintiff's sole complaint related to "her peers" who, contrary to Plaintiff's allegations, were both males and females. *See* **Exhibit D**, at 136-37, 203-5, 212-14, 218-19, 241-45.   Thus, Plaintiff's failure to engage in protected activity presents her entitlement to even claim retaliation and Defendant is entitled to summary judgment as a matter of law on this claim.

**D.    Plaintiff Cannot Establish That She Was Paid Less Than Males Under The Equal Pay Act or Title VII.**

      **1.    No Violation of the Equal Pay Act**

            **a.    <u>The Equal Pay Act requires comparison of jobs of equal skill, effort and responsibility.</u>**

The Equal Pay Act prohibits employers from discriminating "between employees on the basis of sex…for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions."   29 U.S.C.A. § 206(d)(1) (West 1998).   A plaintiff seeking to establish a prima facie case under the Equal Pay Act must demonstrate that: (1) her employer is subject to the Act; (2) she performed work in a

position requiring equal skill, effort, and responsibility under similar working conditions; and (3) she was paid less than members of the opposite sex providing the basis for comparison. *See Jones v. Flagship Int'l*, 793 F.2d 714, 722-23 (5th Cir. 1986). A plaintiff must show that the "skill, effort, and responsibility" required in the jobs compared are "substantially equal." *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir. 1987). Only if the plaintiff is able to make such a showing does the burden of production and persuasion shift to the employer to demonstrate one of the four exemptions, affirmative defenses, provided in the Act. *Plemer v. Parsons-Gilbane*, 713 F.3d 1127, 1136 (5th Cir. 1983). The Act allows employers to make disparate wage payments if those payments are based on (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quality or quantity; or (4) a differential based on *any factor other than sex*. 29 U.S.C.A. § 206(d)(1) (West 1998); *Peters*, 818 F.2d at 1153.

Further, the requirements of "equal skill, effort and responsibility" under similar working conditions are considered to constitute three separate tests, each of which must be met in order for the equal pay standards to apply. *See EEOC v. TXI Operations, L.P.*, 394 F. Supp. 2d 868, 878 (N.D. Tex. 2005) (citing 29 C.F.R. § 1620.14(a) (2004)). "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." *TXI Operations*, 394 F. Supp. 2d at 877 (quoting 29 C.F.R. § 1620.17(a) (2004)). In addition, while the jobs are not required to be identical, the Equal Pay Act will not be violated where only a portion of jobs overlap. *TXI Operations, L.P.*, 394 F. Supp. 2d at 875. Moreover, courts have recognized that different job levels, different skill levels, previous training, experience, prior salary history, performance, and competitor's offers are all valid "other than sex" factors justifying differences in pay. *Pouncy v. Prudential Ins. Co.*, 669 F.2d 795, 802-03 (5th Cir. 1982); *TXI Operations, L.P.*, 394 F. Supp. 2d at 878. While job

description may be a factor in Equal Pay Act cases, it is the actual duties performed that are accorded more weight than the descriptions. *TXI Operations, L.P.*, 394 F. Supp. 2d at 876.

In *TXI Operations*, the EEOC brought suit on behalf of a female, Fundling, working in the legal department of her employer alleging violations of the Equal Pay Act and Title VII regarding her salary. 394 F. Supp. 2d at 870. A number of years after Fundling was hired, her employer hired a male, Schlenker, at a substantially higher salary. *Id.* at 872. Schlenker was subsequently promoted so that Fundling now reported to him. Fundling filed a charge with the EEOC which later filed suit on her behalf. She resigned six months after the suit was filed. In granting summary judgment to her employer, the Texas district court found that while it could not state as a matter of law that Fundling's and Schlenker's positions were dissimilar, there were substantial differences in the job responsibility exercised by the employees. *Id.* at 877. In support of this finding, the court pointed to the fact that Fundling admitted that Schlenker exercised more responsibility than she did. Since Fundling could not establish this factor, her claim failed as a matter of law. The court went on, however, to conclude that even if Fundling had demonstrated equal skill, effort, and responsibility her employer offered valid explanations justifying the wage differences. *Id.* at 878. The court found that Schlenker's experience was wider than that of Fundling, that Schlenker handled more complex legal work than Fundling, as Fundling admitted, that the employer was experiencing a significantly increasing workload in the legal department, and that the employer paid Schlenker in line with its preset salary classifications, and that each one of these reasons were valid to justify the wage differences. *Id.* at 878-79.

b.   **By definition, practice and performance, Plaintiff Browning cannot establish that she performed equal work on jobs the performance of which required equal skill, effort and responsibility, and which are performed under similar working conditions.**

There are numerous differences between the Research Scientist and Senior Research Scientist positions that render these jobs unequal. Dr. David Pickett has held both the Research Scientist and the Senior Research Scientist positions in Division 20 under Drs. Pearcy, Sagar and Patrick. Indeed, Dr. Pickett was a Research Scientist for *over six years* (June 1994 to September 2000) prior to his advancement to Senior Research Scientist) and is thus qualified to provide insight into the differences in the expectations and required skill, effort and responsibilities of the two positions. For example, as testified to by Dr. Pickett in his deposition, a Research Scientist is not expected to be a project manager, that is, they are not responsible for meeting financial budgets and schedules for deliverables, while a Senior Research Scientist is. *See* **Exhibit V**, Deposition of Dr. Pickett p. 23. A project manager must take part in writing the project plan, monitor the spending on the project to ensure that it's within the plan, ensure that any products of the project are delivered on time, bring together the staff involved in the project and ensure that they are aware of their responsibilities in the project, communicate directly with the client on anything having to do with the work on the project, and ensure that the client's expectations on the project are being met. *See id.* p. 24. In addition, a Research Scientist is not expected to have a prominent role in technical activities. *See id.* p. 25. Nor is a Research Scientist expected to have as many presentations or publications as a Senior Research Scientist. *See id.* Likewise, a Research Scientist is not expected to be seen as an experienced resource for the Institute's or the client's staff, or to have complete understanding of the Institute and how it operates. *See id.* p.26. Finally, a Research Scientist may not have developed relationships or projects with members of other divisions and is not expected to have responsibility for ensuring other staff

members are available for their collaboration.  *See id.*  This is not to say that a Research Scientist will not perform some of these functions (in fact they will as the Research Scientist position is a training, education, skill development and experience ground for the Senior Research Scientist position) but, rather, the expectations and degree of performance to which a Research Scientist will be held on tasks of this nature will not be as high as that of one in Senior Research Scientist role.

Further evidencing the difference in job duties, skill and experience of persons in these positions, when asked to identify those persons to whom she compared herself, Plaintiff identified David Pickett, David Turner, Roberto Pabalan and William Murphy.  **Exhibit D**, Plaintiff's Deposition at 93, 167-68.  Yet upon further questioning, Plaintiff admitted that she had little knowledge of the day-to-day activities of Drs. Pickett, Turner, Pabalan, and Murphy.  *See* **Exhibit D**, Plaintiff's Deposition at 189.  In fact, it appears that she identified these scientists simply because they were in higher positions with higher salaries than she, not because their positions required equal skill, effort and responsibility under similar working conditions.  *See* **Exhibit D**, Plaintiff's Deposition at 168-69.  In fact, Plaintiff also admitted that each of these individuals specialized in a different area of scientific research and performed independent tests within their particular fields of expertise.  *See* **Exhibit D**, Plaintiff's Deposition at 174.  Additionally, Browning admitted that she had less interactions professionally with Dr. Pickett and Dr. Turner than she did with Dr. Pabalan and Dr. Murphy due to their areas of specialization.  *See* **Exhibit D**, Plaintiff's Deposition at 191.  As is clear from Plaintiff's own testimony, Plaintiff cannot establish that she performed equal work on jobs the performance of which required equal skill, effort and responsibility, and which are performed under similar working conditions as Drs.

Pickett, Turner, Pabalan, and Murphy.  Failing to do so entitles Defendant to summary judgment as a matter of law.

        **c.**        **Defendant's pay practices are, regardless, based on legitimate factors other than sex.**

Moreover, even if assuming *arguendo* Plaintiff were to establish that she was performing equal work for unequal pay, the Institute has clearly established that one or more of the defenses to the Equal Pay Act apply.  In short, unequivocally, the Institute is allowed to make disparate wage payments to the scientists identified by Browning based upon factors other than sex, including but not limited to an employee's greater experience level and seniority at the Institute, as well as the breadth and depth of their contributions to Institute programs.

Indeed, Plaintiff admitted that each of the scientists that she identified as her comparables, Drs. Pickett, Turner, Pabalan, and Murphy, *had more years of experience since their Ph.D. than she*.  *See* **Exhibit D**, Plaintiff's Deposition at 186.  Dr. Murphy in particular had more years of experience since his Ph.D. than Plaintiff as well as more experience conducting research in the laboratory, in the field, and with numerical modeling.  Dr. Pabalan had more years of experience since his Ph.D. and was more knowledgeable than Browning in the area of complex aqueous chemical reactions and interactions of high-salinity brines.  Dr. Turner was very skilled in laboratory and numerical studies of the sorption of radioactive materials on rocks and minerals, with his investigations being incorporated in internationally accepted databases, as well as in addressing environmental topics, doing programmatic reviews, and developing and implementing sensitive regulatory guidelines.  In addition, each of the scientists identified maintained a higher position within the Institute and had a greater level of responsibility than Browning.  Dr. Pickett was a Senior Research Scientist.  Dr. Turner was a Principal Scientist until he moved into management.  Dr. Pabalan was also a Principal Scientist.

Finally, Dr. Murphy was a Staff Scientist when he left the Institute.  *See* **Exhibit D**, Plaintiff's Deposition at 186-191; **Exhibit W**, SwRI's Career Ladders.

Curiously, Browning does not contend that she was paid less than the other Research Scientists, Melissa Nugent, James Prikryl, and the one unidentified scientist, within Division 20. Instead, Plaintiff simply picks other employees who held job titles higher up the Career Ladder than she.  *See* **Exhibit D**, Plaintiff's Deposition at 167-69.

Finally, it is unequivocal that each of the persons to whom Plaintiff compared herself *had greater seniority with the Institute* than did Plaintiff.  Specifically, Plaintiff was hired as a limited term employee in December 1998 – Dr. Murphy was hired ten years earlier in 1988, Dr. Turner eight years earlier in 1990, Dr. Pabalan ten years earlier in 1988, and Dr. Pickett four years earlier in 1994. The curricula vitae (or most available information for Dr. Murphy who is no longer an Institute employee) for each of Drs. Murphy, Turner, Pabalan and Pickett is attached as **Exhibits X, Y, Z, and AA.** [8]  (The Affidavit of Wes Patrick as Custodian of Records for these personnel file materials is attached as **Exhibit II.**)

In sum, Plaintiff cannot establish that she performed equal work on jobs the performance of which required equal skill, effort and responsibility, and which are performed under similar working conditions.  Moreover, even if she could, the Institute has established that one or more of the exemptions to the Equal Pay Act apply to allow disparate wage payments.  Therefore, summary judgment is proper for Defendant on Browning's Equal Pay Act claim.

---

[8] Further evidencing the unique, superior and superlative qualifications of Dr. Murphy in his field of expertise is Dr. Murphy's recent United States appointment as a member of the Nuclear Waste Technical Review Board (NWTRB), which reports directly to the U.S. Congress. This appointment could well be said to define the height of excellence in this field.

2.       **No violation of Title VII based on pay.**

Under Title VII, "it shall be an unlawful employment practice for an employer...(1) to

fail or refuse to hire or to discharge any individual...because of such individual's race, color,

religion, sex, or national origin.  42 U.S.C.A. § 2000e-2(a)(1) (West. 2003).  A plaintiff seeking

to establish a prima facie case of wage discrimination under Title VII must show that "he or she

[occupied] a job similar to that of higher paid workers of the opposite sex." *Lenihan v. Boeing

Co.*, 994 F. Supp. 776, 798 (S.D. Tex. 1998) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d

1013, 1019 (11th Cir. 1994)).  If a plaintiff is able to establish her prima facie case, the burden of

production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its

action.  *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Lenihan*,

994 F. Supp. at 798; *TXI Operations, L.P.*, 394 F. Supp. 2d at 881.  Once the defendant satisfies

this burden, the presumption of discrimination created by the prima facie case disappears and the

plaintiff must prove that the defendant's proffered reasons are a pretext for discrimination.

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *Lenihan*, 994 F. Supp. at 798.

Furthermore, Title VII incorporates the Equal Pay Act's exemptions and defenses permitting

dissimilar wages.  *See County of Washington, Oregon v. Gunther*, 452 U.S. 161, 171 (1981); *TXI

Operations, L.P.*, 394 F. Supp. 2d at 881.  Thus, unlike the Equal Pay Act, a Title VII plaintiff

must prove that the employer acted with discriminatory *intent* and this burden remains with the

plaintiff at all times.  *See Peters*, 818 F.2d at 1153-54.  Moreover, only similarly situated

employees are relevant to a claim of disparate treatment under Title VII.  *See Krystek v. Univ. of

S. Miss.*, 164 F.3d 251, 257 (5th Cir. 1999) (recognizing that facts related to employees who

were not similarly situated to the plaintiff were irrelevant).

Plaintiff Browning cannot establish that she was paid less than males for work in a

similar job.  In fact, Plaintiff does not even attempt to compare herself to the Institute employees

who did in fact perform similar jobs, namely, the other Research Scientist within Division 20. Instead, Browning claims that since there are basic job duties similar to all scientists at the Institute, she should have been paid in line with male scientists who occupied higher positions within the Institute than she did. Since these employees did not perform work in a job similar to Plaintiff, Plaintiff cannot compare herself to these employees for Title VII purposes. Even if the employees did perform similar jobs, as discussed above, the Institute has clearly established that these employees had more experience, prior to and/or while at SwRI, and/or occupied positions with greater levels of responsibility than Plaintiff, justifying the disparate wages. Thus, Plaintiff cannot establish that she was paid less than males for work in similar jobs, and her wage claims under Title VII fail as a matter of law. Therefore, summary judgment for Defendant is proper.

**E.      Plaintiff Cannot Establish as a Matter of Law That the Institute Failed to Promote her.**

      **1.      Plaintiff cannot establish a *prima facie* case of failure to promote.**

Plaintiff Browning was not promoted because she failed to satisfy the Institute's requirements for promotion. To establish a prima facie case on her failure to promote claim, Browning must establish that (1) she is a member of the protected class; (2) she sought and was qualified for the position; (3) she was rejected for the position; and (4) the Institute continued to seek applicants with Plaintiff's qualifications. *See Celestine v. Petroleos de Venezuella, S.A.*, 266 F.3d 343, 354-355 (5th Cir. 2001); *Haynes v. Pennzoil*, 207 F.3d 296, 300 (5th Cir. 2000); *see also Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681 (5th Cir. 2001) (recognizing that an employee must demonstrate that he or she meets the employer's objective criteria at the prima facie case stage); *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 501 (7th Cir. 1998) (affirming grant of summary judgment in favor of employer where plaintiff "simply asserted that she was generally qualified for the promotions that she sought" and did not address deficiencies in her

performance evaluations).  The establishment of the prima facie case "raises an inference of intentional discrimination, and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Celestine*, 266 F.3d at 354-55.  "If the defendant satisfies this burden, the plaintiff must prove that the proffered reasons are pretextual." *Id.*

Plaintiff has established that she was a member of a protected class, female, that she sought a promotion to a higher rank, and that she was not promoted above the level of Research Scientist.  Fatal to her claim, however, Plaintiff has not and cannot establish that she was qualified for a position above Research Scientist or that the Institute promoted scientists to higher levels with similar qualifications to Plaintiff.  In fact, Plaintiff has not pointed to *any* other scientist that was promoted to a higher rank with similar qualifications to her.

> **2.  Defendant has articulated legitimate non-discriminatory reasons for Plaintiff's lack of promotion which Plaintiff has not shown to be pretextual.**

Plaintiff was not promoted because she did not meet Division 20's requirements for promotion.  In her Complaint and at her deposition, Browning alleged that the Institute failed to promote her to the positions of Principal Scientist and Staff Scientist.  These positions are two and three levels, respectively, above her status as a Research Scientist, the position which Plaintiff held until she voluntarily resigned from the Institute.  Progression through the career ladder is accomplished sequentially and it does not appear that *any* scientist has ever advanced two levels at one time.  *See* **Exhibit B**, Deposition of Dr. Pearcy at 90; **Exhibit A**, Affidavit of Dr. Patrick.  Plaintiff has herself failed to identify any Division 20 employee who has ever made the single action, two or three position leap in job title from Research Scientist to Principal Scientist or Staff Scientist.  In short, Plaintiff claims she was unlawfully discriminated against

because she was not given a two or three level advancement in job title, yet Plaintiff has not (and cannot) identify any male employee awarded such a promotion.

As stated, Division 20 policy and practice dictates that an employee at one level is not eligible for advancement to the next higher level until he or she has held the lower position and has received two consecutive clearly outstanding performance ratings. Moreover, the technical staff of the CNWRA do not compete against each other for a position or progression in title. *See* **Exhibit A**, Affidavit of Dr. Patrick. Plaintiff admits that she did not hold the positions just below that of Principal Scientist or Staff Scientist and had never received the two clearly outstanding evaluations in sequence that would have allowed promotion to any higher level. Despite her acknowledged lack of qualifications for promotion, and despite Plaintiff's knowledge that Division 20 had not deviated from this protocol in the past, Browning asked the Institute to waive this requirement and to "do whatever they needed to do to give [*her*] the appropriate salary and status adjustments." *See* **Exhibit D**, Plaintiff's Deposition at 118-19, 228. These facts clearly demonstrate that Browning was not promoted because she did not meet Division 20's legitimate non-discriminatory requirements for promotion – because Plaintiff did not meet these qualifications she was not promoted. Moreover, Plaintiff does not – and cannot – point to any male scientist who has been promoted in Division 20 to a next higher position (let alone two and three levels higher positions) without meeting these requirements. The absence of discriminatory treatment between men and women by Division 20 in this regard prevents Plaintiff from any argument of pretext.

> **3.    The advancement of women and men within the Geochemistry element further evidences the absence of discriminatory treatment of Plaintiff.**

Finally, as discussed above, for all positions at the Institute there exists a Career Ladder and Job Guidelines. Plaintiff was hired at the second level for the scientist ladder. The job

progression for this career ladder is Scientist, Research Scientist, Senior Research Scientist, Principal Scientist, Staff Scientist and Institute Scientist. Advancement or progression from one level to the next is based purely on one's readiness, qualifications, experience and current job performance. There is no minimum or maximum time in one level prior to progression to the next. **Exhibit A**, Affidavit of Dr. Patrick; **Exhibit W**, SwRI Career Ladders and Job Guidelines. *See* **Exhibit S**, Budhi Sagar Memorandum. For example:

At least one employee, James Prikryl, a male employee in Division 20 in the Geochemistry and Geohydrology section was hired as a Scientist in November 1990, promoted to Research Scientist four years later in October 1994, and held the position of Research Scientist (the same as Plaintiff) for *over 10 years* prior to his promotion to Senior Research Scientist in September 2004. **Exhibit BB**, Prikryl personnel documents.

Conversely, another employee, Dr. Debra Hughson, a female employee hired in July 1998 as a Research Scientist in Division 20 held this position for only just over *1½ years* prior to her promotion to Senior Research Scientist in March 2000. **Exhibit CC**, Hughson personnel documents.

In contrast, Dr. David Pickett, a male employee was hired into Division 20 in the Geochemistry and Geohydrology section in June 1994 as a Research Scientist and held that position for *over 6 years* prior to his promotion to Senior Research Scientist in September 2000. **Exhibit DD**, Pickett personnel documents.

Similarly, Ronald Janetzke, a male employee joined Division 20 in 1992 as a Senior Research Scientist and still holds that position today, some *14 years later*. **Exhibit EE**, Janetzke personnel documents.

Finally, Dr. Jude McMurry, a female employee, was interviewed and selected for hire in March 2004 (prior to Plaintiff quitting) into the position of Senior Research Scientist (the title Plaintiff wanted), also in Division 20, also in the Geochemistry element, and also under the supervision of Dr. English Pearcy. After her start date in August 2004, Dr. McMurry held the position of Senior Research Scientist for only *1½ years* prior to her promotion to Principal Scientist in March 2006. **Exhibit FF**, McMurry personnel documents. (The Affidavit of Bill Crumlett as Custodian of Records for the personnel file materials of Prikryl, Hughson, Pickett, Janetzke and McMurry is attached as **Exhibit JJ**.)

These persons are Plaintiff's comparators, men and women alike holding the same position as Plaintiff and/or striving for the same job advancement or promotion. Some, like Debra Hughson, held the position of Research Scientist for less than two years prior to her advancement to Senior Research Scientist, while others like James Prikryl and David Pickett were Research Scientists for over ten and six years, respectively, prior to promotion. Plaintiff's approximate *3½ years* as a Research Scientist since her selection as a regular term employee, or even Plaintiff's still less than six years as a Research Scientist if measured from the inception of her employment as a limited term employee, still evidences the absence of gender based discriminatory treatment between men and women of the Division in their advancement.

Indeed, further evidencing the lack of discriminatory treatment by Division 20 in general and Drs. Pearcy, Sagar and Patrick specifically, another female employee Dr. Jude McMurry was hired into the higher level Senior Research Scientist position from the commencement of her SwRI employment – by the same persons, the same actors, that Plaintiff contends discriminated against her based on gender. For Plaintiff to allege that she was the subject of intentional gender discrimination by the same persons who, just two months before Plaintiff decided to quit,

interviewed and selected for hire another woman into the Senior Research Scientist level position

which Plaintiff sought, another individual of the same gender, defies any legal theory, let alone

any logic. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (expressing approval

for the "same actor" inference which gives rise to an inference that discrimination was not the

motive behind the employer's actions where the same actor was responsible for hiring and firing

decisions); *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 174 (8th Cir. 1992) ("The most

important fact here is that plaintiff was a member of the protected age group both at the time of

his hiring and at the time of his firing, and that the same people who hired him also fired him.");

*Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (applying the same actor inference and urging

early dismissal of cases where the same individual both hired and fired the plaintiff).

Based on the foregoing, it is clear that Plaintiff has failed to establish any basis for

alleged discriminatory treatment based on sex.  Not only has Plaintiff failed to establish a *prima*

*facie* case of Title VII discrimination in failing to promote but Defendant has articulated a

legitimate non-discriminatory reason for its actions.  Moreover, Plaintiff cannot establish such

reason as pretextual.  As such, Defendant is entitled to summary judgment as a matter of law on

Plaintiff's claim of alleged failure to promote.

**F.     Plaintiff Cannot Establish as a Matter of Law that She Was Retaliated Against for Any Alleged Complaint Regarding Unequal Pay.[9]**

   **1.     Plaintiff cannot establish a prima facie case of retaliation.**

A plaintiff seeking to establish a retaliation claim under Title VII or the Equal Pay Act

must prove that: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered a

materially adverse action; and (3) there is a causal nexus between the protected activity and the

---

[9] As discussed above, Plaintiff cannot assert a claim of retaliation if Plaintiff has failed to exhaust her administrative remedies in this regard.  Nothing herein should be construed as a waiver of Defendant's position but, rather, these are additional arguments of why Plaintiff's theory fails and Defendant is entitled to summary judgment.

materially adverse action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. __ (June 22, 2006); *see also Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 439 (5th Cir. 2005) (considering a retaliation claim under Title VII); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (considering a retaliation claim under Title VII and the Equal Pay Act); *Salmons v. Dollar Gen. Corp.*, 989 F. Supp. 730, 737-38 (D. Md. 1996) (considering a retaliation claim under both Title VII and the Equal Pay Act). If the plaintiff establishes a prima facie case, "the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action." *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001). "If the defendant satisfies this burden, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." *Id.* at 286. Plaintiff Browning cannot do so herein.

## 2. Plaintiff did not engage in a protected activity.

Browning cannot establish that she engaged in a protected activity under Title VII or the Equal Pay Act because she never complained of unequal pay relative to her male co-workers. An employee engages in protected activity under Title VII only where the employee (1) opposes any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996). In addition, the employee must establish that he or she had an "objectively reasonable belief that the employer's practices were unlawful." *Buenrostro v. Flight Safety Int'l, Inc.*, 151 F. Supp. 2d 788 (W.D. Tex. 2001). Likewise, under the Equal Pay Act, an employer is prohibited from discharging or in any other manner discriminating against any employee because the employee has filed any complaint or instituted or caused to be instituted any complaint alleging a violation of the Equal Pay Act. 29 U.S.C.A. § 215(a)(3) (West 1998).

While it is clear from the facts that Browning was dissatisfied about her salary and wanted a bigger raise, it is equally clear that Plaintiff never complained about unequal pay relative to her male co-workers. As proof of her complaints regarding her salary, Browning points to discussions she had in 2001 with Dr. Pearcy, at which time she provided him with a graph of her salary. Browning also claims that she had a conversation with Dr. Pearcy regarding her salary at a meeting at Starbucks in April of 2004. Despite her claims, Plaintiff *never* mentioned to Dr. Pearcy that she was or believed she was paid less than men doing the same type of work. *See* **Exhibit B**, Deposition of Dr. Pearcy at 117. Nor did Browning inquire of Dr. Pearcy whether she was being undercompensated because she was a female scientist. *See* **Exhibit B**, Deposition of Dr. Pearcy at 134.

Instead Plaintiff points to her yearly performance evaluations from 2002 forward as evidence that she "complained" to Dr. Patrick about her salary. *See* **Exhibit D**, Plaintiff's Deposition at 209. In these evaluations, Browning included a statement to the effect that she felt undercompensated for the nature and extent of the benefits that she brought to the table on behalf of the Institute's client relative to my peers. At her deposition, Browning added that all of her peers were male. *See* **Exhibit D**, Plaintiff's Deposition at 212. This apparently ignores the fact that at different periods at least three of Browning's peers were female, Melissa Nugent, Debra Hughson and Sarah Gonzalez. Moreover, there is nothing in the evaluation that indicates that Browning felt that the pay disparity was based on sex or that she felt she was not being treated equally to her male counterparts. *See* **Exhibit D**, Plaintiff's Deposition at 212, 214. Browning also alleges that she had a meeting with Dr. Patrick in early 2003 regarding her salary and rank. However, Plaintiff admits that she never stated to Dr. Patrick at this meeting that she was being

underpaid relative to her peers because they were male and she was female or otherwise because of gender. *See* **Exhibit D**, Plaintiff's Deposition at 214.

Further evidencing the absence of gender based distinction in Plaintiff's salary complaints is her participation sometime in 2003, in a meeting with Michael Smith and Randall Fedors, Browning's co-workers within Division 20, and Tony Magaro, who served in the human resources department at the Institute. The purpose of the meeting was for members of the Division 20 DMAC to learn the basis of how the Institute established salaries and ranks for its engineer and scientist level employees. *See* **Exhibit D**, Plaintiff's Deposition at 122-25. At the meeting, Mr. Magaro explained that the Institute used salary curves and survey data to determine salary ranges and provided the salary curves for each individual at the meeting. In addition, Mr. Magaro told the individuals that the Institute's career guidelines were also used to help determine an individual's rank. *See* **Exhibit D**, Plaintiff's Deposition at 125. Despite discussion of salary issues in general as applicable to scientist positions, there is *no* evidence, however, that Browning ever complained to Mr. Magaro at this meeting – *or ever thereafter* -- that she was being underpaid relative to males performing equal work. In fact, *Mr.* Smith's and *Mr.* Fedors' (both engineers) attendance at the meeting only underscores that this meeting was about salaries in general, without distinction based on gender and clearly not about unequal salaries between males and females.

Thus, Browning cannot establish that she ever complained of unequal pay to anyone at the Institute. Therefore, Browning's retaliation claims under Title VII and the Equal Pay Act fail as a matter of law and Defendant is entitled to summary judgment.

### 3.      Plaintiff did not suffer a materially adverse action.

Assuming for the sake of argument that Plaintiff did engage in protected activity by allegedly complaining of unequal salary (a point which Defendant vehemently disputes and there exists no evidence to the contrary), Plaintiff nonetheless did not suffer a materially adverse action based on any of these alleged complaints.  The United States Supreme Court recently clarified the scope of the anti-retaliation provision of Title VII.  *See White*, 548 U.S. at __; *see also* 42 U.S.C.A. § 2000e-2(a) (West 2003).  In *White*, the Court concluded that "the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee."  548 U.S. at __.  Put in context, this "materially adverse" standard means that "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.*  The Court further held that Title VII's anti-retaliation provision "extends beyond workplace-related or employment-related retaliatory acts and harm."  *Id.*   The provision does not, however, "immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.*; *see also Mowbray v. Am. Gen. Life. Cos.*, 162 F. App'x. 369, 374 (5th Cir. 2006), *cert. denied*, 2006 U.S. LEXIS 5211 (June 30, 2006) (holding that a plaintiff could not establish a *prima facie* case of retaliation where the plaintiff was threatened with future termination but did not suffer a decrease in salary, a change in title, or a demotion); *Fairbrother v. Morrison*, 412 F.3d 39, 56-57 (2d Cir. 2005) (holding that a lateral transfer and negative appraisal that did not affect compensation were not materially adverse actions).

a.   **The employment actions of which Plaintiff complains were not material.**

Plaintiff's claims of adverse actions are not material and cannot support her claim of retaliation.  To illustrate, as evidence of an adverse action taken in retaliation for her complaints regarding her salary, Browning claimed at her deposition that her performance evaluations started to go down even though her technical contributions to the program increased.  *See* **Exhibit D**, Plaintiff's Deposition at 217.  However, this claim, even if it were an adverse action which it is not, is not worthy of credence given that Browning complained about salary from the first day she came on the job, that she continued to receive pay increases from that day forward, and that the same people who hired her and who gave her good evaluations and pay raises are the ones she is claiming discriminated against her.  *See* **Exhibit D**, Plaintiff's Deposition at 219-220.  Further, Plaintiff admits in her EEOC charge that the *earliest* date of discriminatory conduct occurred in *November 2003*.  **Exhibit H,** EEOC Charge of Discrimination.  Browning also claims that her work and/or credibility with her peers were in some way undermined as retaliation for her complaints.  However, Browning admits that no one ever told her that they thought lesser of her because of her rank or any other reason.  *See* **Exhibit D**, Plaintiff's Deposition at 221.

Browning further alleges that she was disciplined for two incidents, one involving a time card issue in April 2002, and the other an incident regarding travel reimbursement in June 2003, as support for her retaliation claim.  Yet Plaintiff swore in her EEOC charge that the earliest date of discrimination occurred in *November 2003*.  **Exhibit H,** EEOC Charge of Discrimination.  Furthermore, despite Plaintiff's claimed reliance on these events as acts of retaliation, Plaintiff admits that she was not in any way suspended with or without pay as a result of either of those incidents.  *See* **Exhibit D**, Plaintiff's Deposition at 197.  Nor did these events result in Plaintiff

receiving a pay cut as Plaintiff *never* received a pay cut during the entirety of her employment with the Institute.  In fact, to the contrary, Plaintiff received *pay increases* every single year of her employment with the Institute.  Moreover, Browning was never told or advised that she would be terminated if she failed to correct any particular situation and Plaintiff, in fact, received pay increases in 2003 and 2004 as a result of the evaluation of her performance in those years. *See* **Exhibit D**, Plaintiff's Deposition at 200-01.  Furthermore, as discussed above, Browning was not promoted because she failed to satisfy the Institute's requirements for promotion not because she allegedly complained about unequal pay.  Finally, despite Plaintiff's claims that she should not have been removed from the ISI lead of a major document review, Plaintiff also admits that she was aware of others at the Institute who had been moved in or out of lead positions such as that which she held on the ISI.  *See* **Exhibit D**, Plaintiff's Deposition at 226.  Rather, employees were asked to take the lead or were removed from lead positions for a variety of reasons including other work loads, performances, allowing others to obtain the experience, need for a lead to assume other duties, etc.

In short, none of these claims are material (and many are also untimely based on Plaintiff's own sworn statements) and cannot support Browning's claims that she suffered a materially adverse action as a matter of law.

### 4.   Plaintiff cannot establish a causal connection between her alleged complaints of unequal pay or failure to promote and any alleged adverse action.

Plaintiff cannot establish that she would not have suffered any adverse action but for her complaints regarding unequal pay or failure to promote, assuming for argument's sake that Plaintiff can establish the other elements of her prima facie case.  To establish a causal connection between the protected activity and the adverse action, a plaintiff must show that the employer had knowledge of the employee's protected activity, and that the adverse personnel

action took place shortly after that activity. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Sherrod v. American Airlines*, 132 F.3d 1112, 1122 (5th Cir. 1998).  To determine whether this connection has been established, a court may consider: (1) the plaintiff's past disciplinary record, (2) whether the employer followed its typical policies and procedures when taking adverse action against the employee, and (3) the temporal relationship between the employee's conduct and the adverse act. *See Nowlin v. RTC*, 33 F.3d 498, 507-08 (5th Cir. 1994).  While the timing of the adverse action is not necessarily determinative, "close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. GSA*, 110 F.3d 1180, 1188 (5th Cir. 1997); *Eugene v. Rumsfeld*, 168 F. Supp. 2d 655, 682 (S.D. Tex. 2001).  Conversely, the lack of a temporal relationship between the adverse action and the complaints about discrimination may establish that the two are too attenuated to infer a causal link. *See, e.g., Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (holding that a fifteen-month period between the employee's complaints and the adverse actions was too long to support a claim of retaliation); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (holding that a thirteen-month delay between the employee's complaints and the adverse actions was too long to support a claim of retaliation); *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1370 (7th Cir. 1993) (holding that a nine month delay between the employee's complaints and the adverse actions was too long to support a claim of retaliation).

Browning cannot establish a causal nexus between any alleged materially adverse action and her complaints to the Institute regarding pay, assuming that she can even establish the other elements of her prima facie case.  Browning has admitted that there was essentially no precipitating action that triggered her voluntary resignation.  *See* **Exhibit D**, Plaintiff's

Deposition at 207. In addition, Browning makes only generalized complaints regarding a failure to promote that do not appear to be tied to any specific protected activity. As stated, Browning began complaining of her salary before she started working at the Institute. Further, it is undisputed that Browning received each pay increase to which she was entitled. *See* **Exhibit D**, Plaintiff's Deposition at 198. Thus, Browning cannot demonstrate a causal connection between any alleged protected activity in which she engaged and any alleged materially adverse action she suffered, and summary judgment for Defendant is proper on this claim.

> **5.    Even if Plaintiff has established a prima facie case, Plaintiff cannot establish that the Institute's legitimate non-discriminatory reasons for any alleged adverse action was a pretext for a discriminatory purpose.**

As discussed above, even if the Court were to conclude that Plaintiff has established a prima facie case of retaliation, Plaintiff cannot prove that the Institute's legitimate, non-discriminatory reasons for its employment decisions regarding Plaintiff are a pretext for discrimination. *See, e.g., Aldrup*, 274 F.3d at 286 (stating that the "plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose"); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999) (holding that a mere disagreement with an employer's negative performance assessment is insufficient to show pretext); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (stating that the "question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive"). Nor can Plaintiff establish that "but for" her alleged protected activity she would not have suffered any alleged materially adverse action. *See, e.g., Septimus, v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005) (noting that the Fifth Circuit has consistently required a "but for" standard for proving causation on a Title VII retaliation claim); *Evans v. Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (holding that once the retaliation case reaches the pretext stage the question is whether the plaintiff has shown that the adverse

action would not have occurred "but for" her protected activity); *Alvarez v. UPS Co.*, 398 F. Supp. 2d 543, 551 (N.D. Tex. 2005) (holding that if the defendant meets its burden the ultimate question becomes whether "but for" the protected activity the adverse action would not have occurred). Plaintiff has simply failed to establish that Defendant's numerous legitimate, non-discriminatory reasons for its employment decisions are a pretext for discrimination and summary judgment for Defendant is proper.

WHEREFORE, PREMISES CONSIDERED, Defendant Southwest Research Institute respectfully requests that the Court grant Defendant's Motion for Summary Judgment, dismiss Plaintiffs' causes of action in their entirety with prejudice, award Defendant its costs, and grant Defendant such additional relief as to which it may be justly entitled.

Respectfully submitted,

FULBRIGHT & JAWORSKI L.L.P.

By: _____

Cyndi M. Benedict
State Bar No. 03322000
Stephen J. Romero
State Bar No. 24046756
300 Convent Street, Suite 2200
San Antonio, Texas 78205-3792
Telephone: 210/224-5575
Telecopier: 210/270-7205

Attorneys for Defendant,
Southwest Research Institute

## **CERTIFICATE OF SERVICE**

I hereby certify that pursuant to the Federal Rules of Civil Procedure a true and correct copy of the foregoing has been served certified mail return receipt requested, on the following counsel of record this 25 day of July, 2006:

Hal K. Gillespie
M. Jeanette Fedele
Gillespie, Rozen, Watsky, Motley & Jones, P.C.
3402 Oak Grove, Suite 200
Dallas, Texas 75204

Malinda A. Gaul
Gaul and Dumont
111 Soledad, Suite 725
San Antonio, Texas  78205

Cyndi M. Benedict

31162532.1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LAUREN BROWNING, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CAUSE NO. SA-05-CA-0245-FB |
| | § | |
| SOUTHWEST RESEARCH INSTITUTE | § | |
|     Defendant. | § | |

## ORDER

On this the ___ day of _____, 2006, came on to be heard the Motion for Summary Judgment of Defendant Southwest Research Institute.  The Court considered the motion, Plaintiff's response, and timely filed summary judgment proof, and after reviewing same, determines that summary judgment should be granted.

IT IS THEREFORE, ORDERED, ADJUDGED and DECREED that Defendant's Motion for Summary Judgment be in all things GRANTED; that Plaintiff's suit be DISMISSED in its entirety with prejudice; and that Defendant be awarded such other relief to which it may be entitled.

SIGNED this _____ day of _____, 2006.


_____
FRED BIERY
UNITED STATES DISTRICT JUDGE

31163523.1

- 1 -