IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

AUG 2 5 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| LAUREN BROWNING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO.  SA-05-CA-0245- |
| | § | |
| SOUTHWEST RESEARCH | § | |
| INSTITUTE, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

TO THE HONORABLE  U.S. MAGISTRATE JUDGE JOHN W. PRIMOMO:

Pursuant to FED. R. CIV. P. 56, Plaintiff Lauren Browning ("Browning" or "Plaintiff"), files this Response in Opposition to Defendant's Motion for Summary Judgment and Brief in Support, and respectfully shows the Court as follows:

### I. NATURE OF THE CASE

1.      This is an employment discrimination, retaliation and equal pay case brought under Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and the Equal Pay Act, as amended ("EPA") by Dr. Lauren Browning, a female who is an experienced geochemist and former Research Scientist for Defendant Southwest Research Institute ("SwRI") in its Center for Nuclear Waste Regulatory Analyses (the "Center").  SwRI seeks summary judgment on Browning's claims. As the argument and authorities below illustrate, genuine issues of material fact exist as to each of Browning's claims and SwRI's Motion for Summary Judgment should be denied in its entirety.

## II. <u>SUMMARY OF THE ARGUMENT</u>

In its Motion and Brief, SwRI complete ignores copious amounts of key evidence and fails to fully discuss binding case law limiting its arguments.  Contrary to SwRI's arguments, substantial fact issues that require a jury to make credibility determinations exist, precluding summary judgment on Browning's claims.

## III.  STATEMENT OF FACTS - <br> <u>FACTUAL BASIS FOR OPPOSITION TO DEFENDANT'S MOTION</u>

### A.      General Background on the Parties

Plaintiff, Dr. Lauren Browning, is an experienced Geochemist and former female employee of the Center.  Three years after obtaining her Ph.D., Browning sought and obtained employment at the Center as a Research Scientist  in the Geohydrology and Geochemistry Element of the Center, reporting to Element Manager, English Pearcy.  Ex. 48 ¶ 2. Throughout her tenure at the Center, Browning's scope of responsibilities and performance consistently exceeded that typically expected of a Research Scientist (SE-2).  Ex. 9; Ex. 63, Pearcy dep. 86:15-21, 87:1-5, 106:10-16, 148:25-149:17, 122:19-123:7, 124:10-125:23, 150: 2-151:2.

Defendant SwRI is a private employer in San Antonio which employs individuals, including Browning, in its Center.  All promotions, compensation and other employment decisions for employees in the Center are made by the Element Managers of the Center in conjunction with the Technical Director and President of the Center Ex. 63, Pearcy dep. 18:5-15, 57:7-16, 64:4-65:2. The hierarchy of scientist positions in the Center is, from lowest to highest: Scientist (SE-1), Research Scientist (SE-2), Senior Research Scientist (SE-3), Principal Scientist (SE-4), Staff Scientist (SE-5) and Institute Scientist (SE-6). Ex. 9, Def's Ex. 1, ¶ 8.  This case deals with the SE-2 through SE-4 levels.

**B.**  **Browning Begins Her Employment with SwRI**

Before joining SwRI, Browning received a Bachelor's of Science in Geology at the University of Texas in 1990 and by 1995, had obtained her Ph.D. in Geosciences from the University of Tennessee. Ex. 27, SwRI 802-805; Ex. 48 ¶ 4. By the time Browning joined the Center, she had completed more than three years postdoctoral work and gained considerable experience in the earth sciences and modeling techniques valued at the Center. Ex. 6; Ex. 29; Ex. 48 ¶ . Particularly, Browning had approximately eight years' experience in geochemical modeling, a predictive scientific technique used extensively at the Center and which was a required skill set for Geochemists at the Center. *Id.* In 1998 Browning sought and obtained employment with SwRI at the Center. Despite her credentials, SwRI initially offered her a salary of just $42,000 a year.[1] Browning negotiated for a higher salary commensurate with the duties that had been described during the interview process, after she submitted her application. Ex. 30, SwRI 843-844. SwRI responded with an offer of $45,000, which Browning accepted based on Pearcy's assurances that her salary would quickly grow to the range she sought. Ex. 62, Browning dep. 84:20-24. SwRI hired Browning as a Limited-Term Research Scientist. SwRI counts an employee's time as a limited-term employee the same as it does regular full-time employment for purposes of assessing seniority with SwRI. Ex. 64, Sagar dep. 14:21-15:10.

**C.**  **SwRI Hires Males with Similar Credentials at a Higher Rate of Pay**

Browning's supervisors recognized the value of her work to the Center both at the time of her hire and continuing throughout her tenure. Exs.6, 28, 29, 36-41; Ex. 63, Pearcy dep. 86:15-21,

---

[1] Browning's initial salary was low compare to males hired into the SE-2 position hired before or near the time Browning wsa hired: Paul Bertetti hired 11/98 at $44,000, Ex. 12; Scott Painter hired 6/29/98 at $62,000, Ex.18; David Farrell hired 6/1/98 at 48,000. Ex. 15; Britt Hill hired 1/27/93 at $48,000, Ex. 17, SwRI2 672. Ten years earlier SwIR made Roberto Pabalan an initial salary of just $2,000 less than its 1998 offer to Browning. Ex. 65, Pabalan dep. 10:23-11:3.

87:1-5, 106:10-16, 148:25-149:17, 122:19-123:7, 124:10-125:23, 150: 2-151:2.   However, the Center offered Browning a significantly lower rate of salary then in did men that it hired into the Research Scientist position shortly before and after Browning's hire.   For instance, in November 1998, the Center hired Paul Bertetti as a Research Scientist at a annual salary of $44,000.00. Ex. 12. At the time of his hire, Bertetti held only a B.S. and had two years of relevant experience. Ex. 13, SwRI2 99-103)   Just three short months before Browning attempted to negotiate upward from a $42,000.00 offer, SwRI offered David Farrell $48,000.00 to join the Center as a Research Scientist. Ex. 15. Farrell, like Browning, held a Ph.D.  However, Farrell received his Ph.D. in 1997, two years after Browning. Ex. 7, 11, SwRI2 491, 482-83.    Farrell had approximately one year of work experience as a post-doctoral researcher.  *Id.*  Scott Painter, another candidate for the position of research scientist at the Center, netted an offer of $62,000.00 from SwRI on June 29, 1998.  Ex. 18.

Although Browning negotiated for a nominally higher salary, no one at SwRI ever again reviewed Browning's salary, for purposes of determining whether a market adjustment was necessary, against its substantial documentation regarding salary ranges for scientists in the Center. Ex. 66, Patrick dep. 40:14-19; Ex. 69. Crumlett dep. 14:2-17.   Thus, Browning's artificially low initial salary had lasting affects, keeping her salary well below that of her male peers throughout her entire career at SwRI.  *See* Exs. 8, 20-26.  From about January 2002 until approximately August 2003,[2] Browning was the only female holding the position of Research Scientist or above (Ex. 4; Ex. 48 ¶ 10), and she was not only the lowest-paid Research Scientist in the Center (*Id.*), SwRI also compensated her lower than even those with similar seniority who lacked a Ph.D. Ex. 13.

---

[2]  In August 2003, SwRI hired another female Research Scientist in the Center.

E.   **Browning Takes Leadership role of the Quantity and Chemistry Integrated Sub-Issue ("Q&C ISI" or "ISI") after a Senior GeoChemist Leaves SwRI**

Browning did excellent work for the Center, and earned an extension of her initial one-year contract. Ex. 32. So when a very senior scientist, Staff Scientist (SE-6) Bill Murphy, left the Center in 2000, Patrick arranged for Murphy's position to be reclassified to a lower level (Ex. 35) and he selected Browning to fill that regular full-time opening.  Ex. 34.  In October 2000, Browning took on a role that Murphy previously filled, the technical lead of the Quantity and Chemistry Integrated Subissue,[3] ( the "Q&C ISI" or "ISI"). Ex. 38, SwRI 704; Ex. 48 ¶ 12.  However, despite Browning's history of performance and expanded responsibilities, Browning's Element Manger, Pearcy, Technical Director Budhi Sagar and Center President Wes Patrick ("Center Management") failed to review Browning's salary against SwRI's annual "maturity curves" produced by HR, which showed the typical salaries of SwRI scientists charted on a curve, to determine whether a market adjustment would be appropriate. Ex. 66, Patrick dep. 40:14-19.  Nor did they consider, despite Pearcy's early assurances, raising Browning's salary in light of her increased job responsibilities. *Id.*

Browning continued to perform exceedingly well, taking on and performing with distinction, responsibilities that were typically accomplished by Center scientists at the SE-3 and SE-4 levels of their careers.  Ex. 63, Pearcy dep. 86:15-21, 87:1-5, 106:10-16, 122:19-123:7, 124:10-125:23, 148:25-149:17, 150: 2-151:2.  As early as 2000, Browning's management was so confident in her work that they had her represent the Center at major meetings and conferences in place of more senior staff members. Exs. SwRI 703, Pabalan dep. 40:12-20; Pearcy dep. 106:17-107:1, 107:10-17. SwRI's own descriptions reveal that  Browning was performing far above the Center's expectations for an employee a the Research Scientist level, and had satisfied SwRI's "Career Ladder and Job

---

[3]  Pearcy characterized Browning's role as that of "Principal Investigator."  *See* Ex. 7, 11.

Guidelines" for progressing to the next level in the Career Ladder – Senior Research Scientist. Exs. 9, 63, Pearcy dep. 86:15-21, 87:1-5, 106:10-16, 148:25-149:17, 150: 2-151:2.

**F.      Lauren Browning Complains of Gender-Based Salary Disparity in her Compensation**

In or around January 2001, after completing a successful and highly commended year of service at the Center, Browning requested that management consider her for promotion.    Ex. . 38, SwRI 710.  Browning brought Pearcy an American Chemistry Society salary survey that indicated Browning's salary with SwRI fell below the bottom tenth percentile of typical chemists' salaries. Ex. 62, Browning dep.243:13-20, Ex. 49.  Browning noted that the survey showed that female chemists generally earned less than their male counterparts and asked Pearcy if that was what was happening to her at SwRI. *Id.* Also in or around the Spring of 2001, the United States Department of Labor (the "DOL") contacted SwRI and inquired why Browning's salary was lower than that of the other Center Research Scientists. Ex. 5. The Center received no inquiry from the DOL regarding any other Center employee's salary. Ex. 64, Sagar dep, 65:24-66:10; Ex. 66, Patrick dep. 64:8-21. Yet, even after the DOL inquiry, Center Management failed to compare take any action, such as examine whether a market adjustment were in order, to remedy the disparity of Browning's salary against that of her male peers.  Ex. 64 Sagar dep., 66:24-66:3; Patrick dep. 40:14-19.

In January 2002, shortly before her performance evaluation and while going over her self-evaluation report with Pearcy, Browning renewed the concerns she raised in 2001 and told Pearcy she believed she was being underpaid relative to her peers Ex. 39, SwRI 722.  In January 2002, every Research Scientist, Senior Research Scientist and above employed by the Center was male.  Ex. 43, Ex. 48 ¶ 9.  Pearcy responded by discouraging Browning from attaching the survey to her self-evaluation form, assuring Browning that he would forward her concerns to Sagar and Patrick himself. Ex. 62, Browning dep. 209:3-8.  Neither Pearcy, nor any other manager, director or

president of the Center took any action at all regarding Browning's concern. Ex. 66, Patrick dep. 75:4-76:6; Ex. 63, Pearcy dep. 115:3-11, 116:2-14; Ex. 64.   They never even looked at the SwRI maturity curves to assess the legitimacy of Browning's concerns.   *Id.* Patrick dep. 40:14-19.

In January 2003, Browning again brought up her concerns that she was being underpaid for her contributions to the Center.   Ex. 40, SwRI 732; Ex. 50.  In January 2003, the other Research Scientist, Senior Research Scientist and higher level positions in the Center were all held by men. Ex. 43, Ex. 48 ¶ 9.  Pearcy and Center Management dismissed Browning's complaint because they considered Browning to be ineligible for promotion to the Senior Research Scientist level.  Ex. 64, Sagar dep. 91:4-15.  For the third time, Center Management failed to review the maturity curves or in any way evaluate Browning's salary compared to the salaries paid to male Research Scientists in the Center.  Patrick dep. 40:14-19

### G.    Roberto Pabalan's Discriminatory Behavior Toward Browning

Starting salary was not the only gender difference Browning experienced at the Center.  She was also subject to continuing discriminatory behavior toward her by Principal Scientist Roberto Pabalan.  Browning worked with Pabalan on the Evolution of the Near Field Environment Key Technical Issue ("ENFE KTI" or "ENFE").  Ex. 48 ¶ 5; Ex. 65, Pabalan dep. 17:11-17. On one occasion, Pabalan complained of Browning in her presence to the two other scientists from the Center during a post-convention dinner. Exs. 48, ¶ 4; Ex. 65, Pabalan dep.29:15-30:19 .  When one of them suggested that perhaps Pabalan should help Browning rather than criticize her, Pabalan responded by snatching Browning's wine glass away from her plate and stating, "I'll help Dr. Browning – No more wine for you, Dr. Browning." *Id.*  Browning reported this humiliating incident to her supervisor English Pearcy.  However, Pearcy took no steps to help Plaintiff and did not forward Plaintiff's complaint to the Director of Human Resources.  Ex. 48, ¶ 4.

Pabalan's verbal attacks on Browning continued and intensified throughout her career with SwRI. Browning continued to apprise Pearcy of the escalating attacks and Browning's also attempted, on her own, to resolve the situation. Ex. 48, ¶ 5. However, despite Browning's attempt to utilize SwRI's "Open Door Policy," Pearcy did nothing to address or attempt to alleviate the situation. *Id.* His response was to tell Browning and Pabalan to "Calm down and work with each other." Ex. 64, Sagar dep. 79:7-18.

Despite Pabalan's hostility toward her, which Pabalan did not exhibit to male colleagues, Browning continued to work with Pabalan on ENFE regularly projects including supporting and advising Pabalan on presentations to the NRC, contributing to several papers and monthly reports, and participating in regular teleconferences with the NRC client. Exs. 38-41, SwRI 704, 706-714-716, 726-727,738-739; Ex. 61. It was during at least one of these phone conferences, on or about January 13, 2004, that Pabalan attacked Browning in the hearing of the client, calling her an amateur. Yet, when asked at his deposition about the quality of Browning's work, Pabalan claimed to have too little information about Browning's work to comment. Ex. 65, Pabalan Dep. 47: 20-48: 23, 52: 3-10. But Pabalan testified that "I can comment on her demeanor or her looks or her attitude." Ex. 65, Pabalan Dep. 52: 3-8. It was Pabalan whose January 2004 complaints to Pearcy led to Pearcy removing Browning from her Q&C ISI leadership role a few weeks later. Ex. 64, Sagar dep. 103:24-104:20.

**H.      The Center's Highly Subjective Performance Evaluation Method**

In the Center at SwRI, an employee does not obtain promotion through the traditional process of a position opening and candidates applying for the position. Def.'s Ex. A, pp. 4-5, ¶ 10. Even when an employee leaves the Center, Center management will not post an opening. *Id.* 28:11-24, 43:4-7. However, SwRI strives to maintain a consistent number of scientific staff members in the

Center. Ex. 64, 29:14-21.  In order to fill an opening created by a departing staff member, President Wes Patrick, Technical Director Budhi Sagar and the Element Manager to whom the open position reports determines among themselves who to place in the open position, without the benefit of posting the opening or an application/interview process.  Ex. 64, Sagar dep. 43:4-7.

SwRI states in its motion that promotion decisions are based purely on one's readiness, qualifications, experience and job performance" SwRI's Mot., p. 34.  However, according to SwRI even if one has satisfied these factors, a promotion will not occur unless the Center's Directors and Element Managers ("Managers Group") award the employee two consecutive performance ratings of "Clearly Outstanding."  Def.'s Ex. A ¶ 10.  So that, in effect, the Managers Group has complete control over who will and who will not be "eligible" for promotion.  And even after two consecutive "Clearly Outstanding" ratings, Center management <u>can still</u> withhold a promotion. Def.'s Ex. A ¶, p. 5 ¶ 10.  Promotion depends entirely upon the discretion of the supervising Element Manager, Technical Director and Vice President.  Yet, when the Center wants to promote someone, management makes it happen quickly – within 18 months. Ex.17,  SwRI2 793A, 664, 688-89. However, the Center can also prevent promotion infinitely based on the performance ratings it affixes.

The Center's performance evaluation process, which it developed independent of HR guidance[4] is to have the Managers Group – all of whom were men during Browning's tenure – meet to collectively discuss the evaluations of Center employees. Ex. 64, Sagar dep. 20:14-16.  This open discussion-style evaluation process begins with the Element Manager presenting his assessment of the employee's performance, based on the employee's self-evaluation and the Element Manager's perception. *Id.* 18:5-25 .  Then the performance of all employees of a particular level are discussed

"comparatively" before the Managers Group moves on to the next level of employees. *Id.* 19:11-20:7, 22:6-13.  For instance, the Managers Group discusses the performances of all Research Scientists (SE-2) comparatively. After spending a few minutes weighing each individual's performance, the Managers Group selects the ultimate rating – Clearly Outstanding, Exceeds Expectations, Meets Expectations, and so forth – that it wants to give each individual. *Id.* 19:16-20:11.  Remarkably, no objective criterion exist to guide the Managers Group as to what achievements merit a particular rating. Ex. 63, Pearcy dep. 59:1-9. Rather, "we have a pretty good idea of the break point." Ex.64, Sagar dep.22:2-13.  Not surprisingly, individual members of the Managers Group express different ideas about what it takes to achieving the various ratings.  Ex. 63, Pearcy dep. 59-19-22; Sagar dep. 22:6-13; Ex. , Crumlett dep. 72:12-15.

At the evaluation meeting, the Element Manager controls what positive and negative factors he wishes to share with the group, several of whom may have never worked directly with the individual.  Ex. 63, Pearcy dep. 18, 57:7-16  All members of the Managers Group have an opportunity to comment on the performance of the employee, regardless of whether that Director or Element Manager has directly worked with the employee. Ex. 67, Mackin dep. 29:24-30:17. Simple observations about the employee's conduct as well as statements made by the employee during "Open Door" meetings with their supervisors may be aired in evaluating the employee and considered in the employee's ultimate rating. Ex. 64, Sagar dep. 81:10-82:13.  Comments made by the Managers Group may appear on the employee's performance evaluation.  However, the source of the comment is not identified. Exs. 38-41, SwRI 703, 711, 723, 733.  As a result, the employee may be rated in part on a negative observation that came from an unidentified source and about which her Element Manager has no recall or ability to provide specifics or guidance on how to improve.  Ex. 57, Browning 314.

## I.      The Center Begins a Pattern of Retaliation Against Browning

Pearcy's reaction to the 2001 inquiries regarding Browning's salary inequities were defensive and swift.  He began keeping a secret paper trail[5] on Browning, "documenting" any conduct by Browning that he perceived to be negative. Exs. 7  Browning's working relationship with Pearcy also deteriorated as, to her disappointment and frustration, Pearcy began to interpret virtually everything Browning said as a refusal to participate in Center projects when, in truth, her accomplishments for the Center reveal just the opposite.

In January 2002 Browning explicitly stated her concern to Center Management's attention that her compensation was below that of her peers, all of whom were male. Ex. 39, Ex. 64, Sagar dep. 20:14-16..  SwRI's retaliatory conduct toward Browning intensified, continuing until her constructive discharge on May 21, 2004.  For instance, in 2002, Browning's attempts to record work done outside the traditional 8-to-5 workday – were met with allegations of timecard fraud by Pearcy and Patrick.[6] Ex. 48 ¶ 6, EX. 51,  Meanwhile, non-traditional work hours and work done on person time was either applauded when performed by  male employees and certainly not attacked. Ex. 14, SwRI2 439. Also, Browning frequently attended conferences on her own time, performing work that would further the Center goals and position the Center favorably for obtaining contracts with clients outside the NRC.  Ex. 48, ¶ 13 Moreover, Center Management encouraged her to work on these projects during non-work hours.  *Id*.  Again, while men were commended for their efforts Ex. 14, SwRI 439, Browning received a reprimand and the Center downgraded her performance evaluation a full step – to Meets Expectations (s) – for her efforts.  Ex. 40.

---

[5]  There is evidence to suggest that Pearcy had a habit of keeping a secret paper trail on employees whose resignations he intended to encourage. Ex. 58.

[6]  Pearcy and Patrick changed Browning's April 12, 2002 timecard, alleging she had not worked all eight hours she reported. Ex. _, ¶ 6. However, Pearcy admitted he had no evidence that Browning had not worked all the hours she reported. Ex. _, Pearcy dep. 143:13-18.

Browning's evaluation for 2003 reflects SwRI's ongoing retaliatory conduct. For a second year in a row, Center management gave Browning a diminished performance rating, based on unsupported allegations. Ex. 41.

## J.     Center Management's Retaliation Escalates to a Full-Scale Effort to Force Browning to Resign

Center Management apparently tired of Browning's repeated complaints about SwRI's discriminatory pay practices. In a series of meetings, Center Management literally pointed her to the door. On or about February 9, 2003,[7] during her 2002 performance review meeting with Pearcy, Browning attempted to use SwRI's open door policy by expressing concern about the inequity in her pay and treatment compared to the men working at the Center. Pearcy responded by saying that if she didn't like the way her supervisors treated her, "There's the door," and pointing toward his office door. Ex. 50. A few days later, Patrick confronted Browning in her office about her unequal pay complaints. He referenced the fact that he learned Browning had visited HR to ask about how SwRI set salaries and warned her not to go to HR again. Ex. 52. Patrick cautioned Browning that he had grounds to "terminate [her] employment with cause." Ex. 48 ¶ 8, Ex. 52. Patrick then reminded her that "Texas is a right to work state." *Id.*

By the summer of 2003, SwRI's retaliatory conduct evolved into a full-scale effort to force Browning out of the Center. In June 2003, Center administrator Pat Mackin accosted Browning about her travel expenditures. Shouting at her and pounding his fists on a desk, Mackin accused Browning of abusing SwRI's travel reimbursement policies. Ex. 55. In fact, Browning had

---

[7] SwRI may argue that certain events occurred outside of the actionable time period. However, the Fifth Circuit has recognized the continuing violation exception to Title VII "[w]here the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 474 (5th Cir. 1989). Further, to the extent any of the acts described are time-barred, such acts of discrimination and/or retaliation are considered relevant to the issue of constructive discharge "to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives." *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199-200 (5th Cir. 1992) (quoting *Downey v. So. Nat'l Gas Co.*, 649 F.2d 302, 305 (5th Cir. 1981).

submitted accurate cost estimates for her travel and accommodations, which Sagar approved before she took the trip. Exs.46-47, SwRI3 293, 283-284; 53-54. By July 2003, Center management began looking for an employee to replace Browning. The Center opened a job requisition and began seeking a Senior Research Scientist with the same qualifications as Browning, to do the exact kind of work Browning performed for the Center. Ex. 19.[8] The Center's search for Browning's replacement continued until a new Geochemist was hired sometime in March 2004. Like clockwork, Browning's replacement started work just months after Browning's constructive discharge.

Center management continued its strategy to edge Browning out when on January 30, 2004, without warning, Pearcy removed Browning from her technical lead role for the Q&C ISI. Ex. 63, Pearcy dep. 169:5-11, Ex. 48 ¶ 10; Ex. 56. Pearcy admitted that he had not spoken to Browning in advance about the removal or warned her that her leadership positions were in jeopardy. Ex. 63, Pearcy dep., 169:5-11. Pearcy further admitted that he did not follow the normal procedure of conferring with the other Element Mangers in the Center prior to making the removal decision. Ex. 63, Pearcy dep. 154:12-15, 158:19-160:6. After Pabalan complained to Pearcy about Browning's work in January 2004, Pearcy simply made the decision to skip that step and determined on his own to remove Browning from lead of the Q&C ISI. Ex. 63, Pearcy dep. 154:12-15, 155:9-11. Pearcy then proceeded straight to Sagar and Patrick for approval. *Id.* Pearcy claimed he made this decision out of a loss in confidence about her performance on the project. Ex. 63, Pearcy dep. 154:16-22. Yet, Browning's performance evaluation created just one day earlier made no mention of any deficiency related to meeting NRC objectives. Ex. 41, SwRI 733. In fact, Browning's evaluation notes that her work had been commended by the NRC. *Id.* Pearcy testified that these employment decisions resulted diminished Browning's level or work and responsibility, and that the Center did

---

[8] In fact, the only difference is that the job was for the job title Browning sought – Senior Research Scientist.

not give Browning replacement projects. Ex. 63, Pearcy dep. 169:23-170:2, 5-7.

Pearcy testified that he met with Browning in March or April 2004, allegedly to give her extra encouragement. But at the same time Pearcy's continued to add to his secret dossier on Browning with documentation of shortcomings and meetings that Browning either allegedly missed or for which she was allegedly late, Ex. 7, 11, SwRI 855-86, 859 and multiple drafts carefully documenting the contents of the supposed "encouragement" meeting. Ex. 7, 11, SwRI 854, 857-858. Contrary to offering encouragement, however, Pearcy went over each and every perceived shortcoming in Browning's performance, concluding that in Browning's efforts to get her "downward trending" performance ratings up, she had to remember that she was staring from a negative position and turning that around would take some time. Ex. 57, 59.

For more than three years, Browning kept hoping SwRI would recognize her work with the appropriate ratings and promote her to the SE-3 position. However, from the summer of 2003, culminating with the events of early 2004, Browning's hopes were dashed. Despite her outstanding technical work, her efforts to bring in contract work for the Center, her efforts in making connections for the Center and representing SwRI around the world with coordinating conferences, making presentations and publications, Browning finally realized the Center refused to promote her and refused to review her salary in order to make appropriate market adjustments. SwRI did not push Browning out easily. But by May 10, 2004, the totality of SwRI's discriminatory and retaliatory conduct forced Browning to submit her resignation. Browning's constructive discharge took effect on May 21, 2004

Despite Pearcy's alleged "disappointment" at Browning's departure, no one in the Center – not Pearcy, not Sagar, not Patrick or any Element Manager – asked Browning why she was resigning or asked her to stay. Ex. 62, Browning dep. 193:13-194:1.

## IV.  LEGAL BASIS FOR OPPOSITION TO DEFENDANT'S MOTION

**A.     Summary Judgment Standard of Review**

**1.     Defendant's Summary Judgment Burden**

Rule 56 must be construed, in part, "with due regard for the rights of persons asserting claims adequately based in fact to have those claims and defenses tried to a jury." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  As the Fifth Circuit has stated, "summary judgment is a potent weapon, but 'courts must be mindful of its aims and targets and beware of overkill in its use." *Findeisen v. North East Indep. Sch. Dist.*, 749 F.2d 234, 239 (5th Cir. 1984), *cert. denied*, 471 U.S. 1125 (1985) (quoting *Brunswick Corp. v. Vineberg*, 370 F.3d 605, 612 (5th Cir. 1967)).

Summary judgment is appropriate only if in "viewing the evidence in the light most favorable to [Browning], the record indicates that there is no genuine issue as to any material fact and that [SwRI is] entitled to judgment as a matter of law." *Causey v. Sewell*, 394 F.3d 285,288 (5th Cir. 2004) (citations omitted).  On issues where Browning bears the burden of proof at trial, Defendant can show that summary judgment is proper by pointing out the absence of evidence in the record supporting those issues.  *Rushing v. Kansas City So. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000), *citing Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In contrast, on issues where SwRI bears the burden of proof at trial (such as the Equal Pay Act affirmative defenses),[9] SwRI can only obtain summary judgment by producing evidence to support each element of their affirmative defense and demonstrating the lack of any material fact with regard thereto.  *Rushing*, 185 185 F.3d at 505; *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986) (party bearing burden of persuasion must set forth sufficient evidence to show that burden of persuasion has been satisfied).

---

[9]  *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

Regardless of which party bears the burden of proof on the claims to be tried, the party moving for summary judgment always bears an initial burden of showing that summary judgment is proper.  If the movant fails to make this initial showing, the party opposing summary judgment is not required to submit any evidence in response to the motion, and summary judgment is improper. *Celotex*, 477 U.S. at 325; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159-60, (1970).

### 2.     How the Court Must View the Summary Judgment Evidence

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the Supreme Court unanimously reaffirmed the standards a court must follow in ruling upon motions for summary judgment and motions as a matter of law.[10]  In ruling on motions for summary judgment, *Reeves* indicates that the Court <u>must</u> accept Browning's evidence as true and must draw all reasonable inferences in her favor.  *See Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 255.  Conversely, the Court <u>must</u> <u>not</u> weigh the evidence or make credibility determinations, for "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Reeves*, 530 U.S. at 150-51, *quoting Anderson, 477 U.S. at 255; see also Dibidale of Louisiana, Inc. v. American Bank & Trust Co.*, 916 F.2d 300, 307-08 (5th Cir. 1990) ("[c]redibility assessments are not fit grist for the summary judgment mill"), *amended and reinstated*, 941 F.2d 308 (5th Cir. 1991).

Further, while the Court must review the entire record as a whole, *Reeves* specifically instructs the Court to "*disregard* all evidence favorable to [Defendant] that the jury is not required to believe," which would include evidence favorable to Defendant from interested witnesses such

---

[10] While *Reeves* involved a motion for judgment as a matter of law under FED. R. CIV. P. 50, *Reeves* made clear that the same standards apply to summary judgment motions.  *Reeves* stated, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same,'" *quoting Anderson*, 477 U.S. 242 at 250-51.

as managers or employees of Defendant. *Reeves* states:

> Thus, although the court should review the record as a whole, <u>it must disregard all evidence favorable to the moving party that the jury is not required to believe</u>. That is, the court <u>should give credence to the evidence favoring the nonmovant</u> as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, <u>at least to the extent that the evidence comes from disinterested witnesses</u>.'

*Reeves*, 530 U.S. at 151 (emphasis added), citing Wright & Miller § 299 and quoting *Anderson*, 477 U.S. at 300.

Evidence of discrimination can be either circumstantial or direct. The Supreme Court's unanimous opinions in *Reeves* and *Desert Palace* significantly impact the methods of proof and summary judgment practice in employment discrimination cases. In *Desert Palace*, the Supreme Court held that a plaintiff can obtain a mixed-motive jury instruction on the basis of circumstantial evidence alone and is not required to submit direct evidence of discrimination in order to obtain the instruction. *Id.* at 99-100. *Desert Palace* and *Reeves* also reaffirm the rule that discrimination may be inferred solely from a plaintiff's *prima facie* case and evidence that the employer's asserted reason for the employment decision is false. *Reeves* states:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.' Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves*, at 530 U.S. at 147-48 (internal citations omitted).

Significantly, the Fifth Circuit recently held that *Desert Palace* modifies the third step of the

traditional *McDonnell Douglas* burden-shifting framework at the summary judgment stage in discrimination cases, stating in *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004), that the framework now involves (1) the showing of a prima facie case by Plaintiff, (2) the articulation with admissible evidence of a legitimate non-discriminatory reason by Defendants, and (3) the offering of sufficient evidence to create a genuine issue of material fact either (a) that Defendants' reason is not true **or** (b) that Defendants' reason, while true, is only one of the reasons for their conduct, and another 'motivating factor' is Plaintiff's gender or protected activity. *See Rachid*, 376 F.3d. at 312. It is this third step of the *McDonnell Douglas* burden shifting analysis that is greatly altered by *Desert Palace* and *Rachid.* Under this modified approach to the traditional *McDonnell Douglas* burden shifting, it is clear that summary judgment is not appropriate when a plaintiff sufficiently shows pretext **or** when the plaintiff can establish evidence which may allow a jury to believe that even if defendant's articulated non-discriminatory reason is believed, another motivating factor in Defendant's actions was plaintiff's race or protected activity. *Id. Desert Palace* and *Rachid* allow the jury at trial, not the courts during summary judgment, to determine the weight and credibility to be given to both parties evidence.

**B.     Application of Summary Judgment Standard to this Case**

> **1.   Defendant Cannot Meet its Summary Judgment Burden as to Browning's Constructive Discharge Claim**

A showing of constructive discharge requires that the plaintiff prove by a preponderance of the evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign. *Hooker v. Victoria's Secret Stores, Inc.*, 281 F.3d 1278 (5th Cir. 2001) (citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)). Whether a reasonable employee would feel compelled to resign is a fact-dependent inquiry. *See*

---

*Brown*, 207 F.3d at 782; *Jackson v. Univ. of Texas M.D. Anderson Cancer Ctr.*, No. 01-21233, 54

Fed. Appx. 404 (5th Cir. Oct. 23, 2002) (citing *Barrow v. New Orleans Steamship Ass'n*, 10 F.3d

292 (5th Cir. 1997)).  To aid in this inquiry, the Fifth Circuit considers the following factors: whether

the plaintiff (1) suffered a demotion, (2) experienced a reduction in salary, (3) experienced a

reduction in job responsibilities, (4) was reassigned to menial or degrading work, (5) was reassigned

to work under a younger supervisor, (6) suffered badgering, harassment or humiliation by the

employer calculated to encourage the employee's resignation, or (7) received offers of early

retirement on terms that would leave the employee worse off regardless of acceptance.  *Id.*  These

events are considered singly or in combination.  *Brown*, 207 F.3d at 782.  Plaintiff need not be able

to point to a single "breaking point" event; the totality of a series of events working in tandem is

sufficient to create an intolerable situation.  *Jackson*, 54 Fed. Appx. at 404; *see id*; *Landgraf v. USI

Film Prods.*, 968 F.2d 427, 429-30 (5th Cir. 1992).  That SwRI can point to other cases in which the

Fifth Circuit upheld summary judgment in other employment discrimination cases "does not

establish any 'floor' of intolerable circumstances."[11]  *Hooker*, 281 F.3d at n.4.  Determination of

---

[11] Further, the cases SwRI cites in support of its position are distinguishable.  In *Mowbrary v. Am. Gen. Life Cos.*, 162 Fed. Appx. 369 (5th Cir. 2006), the employee resigned after being offered three options.  Two options included continued employment and one option offered resignation with severance pay of one year's salary plus $70,000.  The Court held no constructive discharge where the employee chose to resign and take the severance pay, but could have chosen continued employment.  Browning had no such options.  In *Harvill v. Westward Comms., L.L.C.*, 433 F.3d 428 (5th Cir. 2005), the Court held no constructive discharge where claim was based on rudeness and "general hatefulness" toward plaintiff by co-workers, an unknown man taking pictures of plaintiff, a meritless racial harassment charge brought against plaintiff and overhearing a co-worker say he would get a bonus if he "ran her off."  Apparently none of these actions originated with plaintiff's supervisors.  In contrast Browning experienced aggravating factors that support a finding of constructive discharge.  These actions originated with her Element Manager, other managers and directors in the Center, and even the Center's President.  In *Reznick v. Assoc'd Orthopedics & Sports Medicine, P.A.*, 104 Fed. Appx. 387 (5th Cir. 2004), the Court held no constructive discharge occurred where the claim was based on disparate opportunities to socialize with partners, failure or refusal to refer patients to plaintiff and incidents occurring two to three years before plaintiff's employment terminated.  Here, Browning bases her claim on a orchestrated and protracted series of events over the last seventeen months of her employment with SwRI.  Her complaints go beyond social opportunities and getting more work – she had work responsibilities taken away.  In *McKethan v. Texas Farm Bureau*, 996 F.2d 734 (5th Cir. 1993) the Court held no constructive discharge where claim was based on a single incident in which the employer humiliated plaintiff with comments made from the podium about him in front a large banquet gathering.  However, Browning bases her claim on a series of actions including those that raise to the "aggravating factor" level directed at her over a 17-month period.  Finally, *Boze v. Branstetter*, 812 F.2d 801 (5th Cir. 1990) limited its holding

---

intolerability "depends on the facts of each case." *Brown*, 207 F.3d at 782.

> **a.    Browning Was Compelled to Resign after SwRI's Conscious and Protracted Plan to Force Browning Out**

The facts in Browning's case amply satisfy the standard for constructive discharge and in fact demonstrate that Browning suffered "aggravating factors" that support a finding of constructive discharge. Before suffering a significant reduction in job duties, Browning first endured harassment, badgering and humiliation intended to make Browning resign.

> *I.    Wes Patrick Threatens Browning's Job*

In January 2003, Browning alerted Center management for the second time about her pay disparity concerns. This time, after Pearcy delivered her performance review, Browning responded to her review noting that management's actions regarding her pay disparity "warrants scrutiny." Ex. 48 ¶ 7, Ex. 52, Ex. 62, Browning dep. 213:11-214:8. This was a warning to SwRI that Browning believed its actions (or failure to act) regarding her disparate pay issue was violating some law or public policy. Ex. 48 ¶ 7. Center President Patrick responded by paying Browning a rare and unanticipated visit. The unexpectedness of Patrick's visit combined with his demeanor created an intimidating confrontation for Browning. Ex. 48 ¶ 8. Patrick was clearly livid that Browning dare suggest that SwRI was doing anything wrong and he responded to her complaint by threatening that he could fire her right then and there, reminding her that Texas was a right to work state. *Id.*

---

with the language "under the prevailing circumstances" a reasonable employee would have completed an internal grievance process or filed a charge before resigning. The "prevailing circumstances" in *Boze* were, Boze was upset about his performance evaluation and an internal grievance process had already been initiated. The critical performance evaluation was the catalyst for Boze's resignation. Here, Browning suffered far more than just a disappointing performance evaluation. Moreover, SwRI had slammed shut the "Open Door" through which Browning might have pursued a grievance, leaving that option unavailable to her. Finally, in the Western District case SwRI cites, *Denman v. Texas Dep't of Licensing & Regulation*, No. SA-04-CA-0620-RF, 2006 U.S. Dist. LEXIS 8094 (W.D.Tex. Jan. 19, 2006), plaintiff, an administrative assistant, based her claim on a transfer from the Executive Office to Office of the General Counsel. She suffered no reduction in pay and was performing essentially the same type of administrative assistant tasks. Further, she quit after working only two days following the transfer. Unlike *Denman*, Browning suffered conditions set forth by the Fifth Circuit as "aggravating factors" over a 17-month period.

     ii.     *Browning Disciplined for Alleged Travel Policy Abuses Despite Evidence that She Followed Travel Policy*

Center Management also subjected Browning to a higher level of scrutiny than her male co-workers when it came to her travel arrangements, records and expense reports.  In June 2003, Director of Administration, Pat Mackin, verbally attacked Browning for exceeding per diem rates during travel to an important international conference. Ex. 55. Mackin scolded Browning stating that she would henceforward be subjected to "an extra level of scrutiny," Ex. 42, Ex. 55.  Mackin was aware of Browning's wage disparity complaints and he did not subject men who went over per diem rates to verbal tirades or an extra layer of scrutiny.  Ex. 67, Mackin dep. 52:19-53:24, Ex. 47. Further, Mackin admitted that he kept closer watch on Browning even though the Center's Technical Director Budhi Sagar had approved Browning's accurate travel costs estimates in excess of per diem. Ex. 42, Ex. 67, Mackin dep. 51:5-18. Mackin admitted he did not bother to find out whether Browning had received approval to exceed per diem rates before he confronted Browning about her travel costs. Ex. 67, Mackin dep. 50:23-51:8.  SwRI alleged on her performance evaluations that Browning did not follow SwRI travel policy because she did not book her travel through the SwRI Travel Office. Ex. 41.  In fact, the evidence reveals that Browning did book her flight reservations through the SwRI Travel Office.  Ex. 53.  Regardless, Browning's 2003 performance evaluation reflected Macklin's unfounded criticisms of Browning.

     iii.     *SwRI Seeks Browning's Replacement and Passes Browning Up for Job Opportunities*

By July 2003, SwRI began in earnest to force Browning out of the Center.  Although no geochemists had left the Center, it opened a requisition for a Senior Research Scientist, the position Browning sought, to do exactly the same work Browning did for the Center and the ENFE KTI. Ex. 19. Despite Browning's knowledge and experience, Center Management did not approach her about

the opportunity. This was the very position to which Browning had requested she be promoted. Not only that, in January 2004, Center Management also Browning forced to interview her own replacement. Def.'s Ex. FF, Qualitative Comments.  Even after this humiliating experience, they again criticized her – both contemporaneously by Pearcy and now in Sari's instant motion – for observing the same technical weakness other Center interviewers noted in the candidate.  Ex. 7, 11, Def.'s Ex. FF, Pearcy and McKauge comments re: modeling.

Later in 2004 Sari began interviewing external candidates for a Principal Scientist (SE-4) in Planetary Sciences.  The Center considered a young man with virtually no post-doctoral work experience who had obtained his Ph.D. only months before the interview for this Principal Scientist (SE-4) position. Ex. 64, Sagar dep. 7-21  Despite Browning's years of experience in the planetary sciences, Center Management did not consider Browning for the position.

*iv.*     *Pearcy Removes Browning from the Q&C ISI Lead*

In addition to badgering, harassment and humiliation directed at her by Center management, Browning also suffered tangible negative changes in her job responsibilities.  In January 2004, shortly before Pearcy gave Browning her 2003 performance evaluation, he decided to removed Browning from her role as Q&C ISI lead. Ex. 64, Sagar dep., 103:11-15, Ex. 56.  He makes this decision without following the usual protocol of consulting other managers and directors.  Pearcy based his decision at least in part on complaints from Pabalan.  Ex. 63, Pearcy dep. 154:12-15, 158:19-160:6; Ex. 64, Sagar dep. 103:25-104:11.  In Browning's performance evaluation completed on January 29, 2004, Pearcy does not mention that Browning will be removed from the ISI lead or that he had any concerns regarding her performance in that area.  Rather, her performance evaluation reveals that the NRC (client for the Q&C ISI activities) commended Browning's performance.  Ex. 41.  However, the next day, Pearcy tells Browning by phone she is being removed as lead due to

performance issues and the concern that she would miss key milestones. Ex. 56

> v.   *Sari Artificially Suppressed Browning's Performance Evaluations –*
> *preventing Her From Ever Achieving a Promotion*

In January 2001 and every year thereafter, Browning alerted Pearcy, Sagar and Patrick that she was being under compensated relative to her peers. She notified them through her self-evaluations and through discussions with Pearcy. Exs. 39-41; Ex. 50; Ex. 62, Browning dep. 243:13-20. She told Pearcy that she wondered if she was the lowest-paid Research Scientist because she was female. Ex. 62, Browning dep. 243:13-20 At the time of each complaint, all of Browning's peers were male. Ex. 43, Ex. 48 ¶ 9. Browning was the **only** female employed in the Center holding the title of Research Scientist or above.

The Managers Group who determined performance evaluations also knew of Browning's complaints. Ex. 39-41. Despite this knowledge and Browning's undisputed excellent work performance (Ex. 63, Pearcy dep. 86:15-21, 87:1-5, 106:10-16, 148:25-149:17, 122:19-123:7, 124:10-125:23, 150: 2-151:2), Sari began to downgrade Browning's performance for subjective and minor alleged offenses including lacking a "can do" attitude or making "gratuitous negative comments" about co-workers. Ex. 39, Sari 711. Attitude and interpersonal negative comments males made toward coworkers (as opposed to Browning's merely commenting about them) did not prevent the male employees from receiving the highest-possible performance rating. Ex. 16

Sari also deducted Browning's performance rating for alleged conduct that did not affect performance ratings when the conduct was committed by a man. Ex. 16. When Browning used personal time to travel to a conference to build extra-NRC business and then worked beyond 5 p.m so that she could still put in 8 full billable hours that same day, Sari called it an unauthorized business trip and accused Browning of falsifying her time card. Based on Pearcy's representations,

that accusation appeared on her performance evaluation and negatively affected Browning's rating, even though Pearcy admitted that he had no evidence Browning had not worked the hours she reported on her time card. Ex. , Pearcy dep. 143:13-18.

Likewise, Browning complained of pay inequality compared to her peers again in January 2003. Again, her concerns were met with unsupported attacks on her attitude, technical rigor, and adherence to travel policy . Ex. 41. These remarks appeared on Browning's performance evaluation and negatively affected her rating. However, Pearcy admits that Browning's attitude was not a problem and Browning's technical work was outstanding. Ex. 63, Pearcy dep. 179: 3-16. Further, travel documents show that Browning booked travel through SwRI's travel office and received advanced approval for her estimated – and accurate – travel costs. Exs. 46-47. Despite Browning's excellent technical performance (Ex. 63, Pearcy dep. 187:15-21), Sari downgraded her performance ratings each and every year after her she first complained of pay disparity. Ex. 39-41. And Sari cannot argue that its decision-makers had been forgotten about the previous-year's complaint. Browning's complaint each year was fresh in the minds of the Managers Group when it met to discuss performance for the previous evaluation period. Browning made her complaint in writing on the self-evaluation that they discussed weeks, or even just days later.

> vi.   *Pearcy Keeps a Secret File on Browning, Consistently Badgers Her about Perceived Shortcomings, and Reminds Browning She Will Not be Promoted for Years*

Over the next three months, Pearcy kept close tabs on Browning's comings and goings, whether she was attending meetings, and how she conducted herself. He documented these observations, keeping a secret paper trail on the shortcomings he perceived in Browning's performance or demeanor. Ex. 7, 11. Additionally, from 1999 to through 2003, Pearcy mentioned performance only once a year at the performance evaluation. However, after the Center resolved to

force Browning's resignation, Pearcy peppered the Spring of 2004 with frequent meetings with Browning to discuss her performance. He took the opportunity at these meetings to instruct her, as a parent instructs a child, to sit up straight at meetings, to lean forward to show that she was interested, and to try to get on Patrick's good side. Ex. 59. Still, Pearcy noted that it would be at least two years before Browning could be promoted. He reminded Browning that "she was starting from a negative," in her efforts to achieve the two successive "Clearly Outstanding" performance ratings she needed for promotion. Exs. 57-58.

In the meantime, Sari hired Browning's replacement to the position of Senior Research Scientist. This new hire began work shortly after Browning's resignation.

> vii.   *Sari Under compensated Browning Relative to Male Research Scientists and Senior Research Scientists*

Finally, from the date of her hire until the date her employment with Sari terminated, Sari paid Browning less than it did males performing substantially similar work. In fact, Browning was the lowest-paid Research Scientist at the Center until, August 2003, Sari hired Sarah Gonzales, a female who had just received her Master's degree. Browning, then in her eighth year of working after obtaining her Ph.D., earned an annual salary that exceeded Ms. Gonzales' by a mere $1,783. Exs. 8, 25.

SwRI's argument, repeated throughout its motion, that no triggering event compelled Browning to resign is misleading. Browning concedes that there was no single precipitating event. However, Browning is not required to produce evidence of a single event in order to demonstrate constructive discharge. *Jackson*, 54 Fed. Appx. 404; *Landgraf*, 968 F2d at 429-30. Rather it was the totality of SwRI's pervasive and ongoing adverse actions toward Browning that created a hostile and intolerable work environment.

**b.     The Fifth Circuit has Upheld A Finding of Constructive Discharge in Far Less Egregious Circumstances**

The parade of threats of termination, harassment, badgering and humiliation Browning endured indicates that genuine issues of material fact exist as to whether the working conditions were so intolerable that a reasonable employee would feel compelled to resign.  Although Browning is not required to prove her case of constructive discharge to defeat SwRI's summary judgment motion, it is notable that the Fifth Circuit has affirmed an actual jury finding of constructive discharge where far less egregious circumstances were present.  In *Hooker*, the Fifth Circuit affirmed a finding of constructive discharge in an ADEA case where the plaintiff's supervisor: (1) required plaintiff, but no other employee, to attend morning meetings, return home and then come back to work later in the afternoons, (2) told a customer that "even [plaintiff]" wore a particular style of lingerie sold by the defendant, (3) was continually "condescending" toward plaintiff, always "sounded so exasperated" when dealing with plaintiff, and used a "reprimanding-a-child type" voice with plaintiff, although the same supervisor treated other employees "normally," (4) singled plaintiff out for harsher criticism than other employees that was delivered in a "louder and more upset" manner than criticism given to other workers, and (5) complained to other employees that plaintiff should quit because she was too old.  281 F.3d 1278.  In comparison, the evidence supporting Browning's claim is far more severe.

**c.     Sari Slammed Shut its "Open Door" Leaving Browning No Option for Grieving Her Situation**

Sari claims that this Court should not find that Browning suffered constructive discharge in part because, according to Sari, Browning had the option to grieve her intolerable working conditions.  *See* Def's Mot., p. 13-14.  As an initial matter Sari overstates the proposition for which *Boze v. Branstetter* stands.  *See* 912 F.2d 801, 805 (5th Cir. 1990).  In *Boze*, the Fifth Circuit found

---

that "under the prevailing circumstances" of the case, a reasonable employee would have completed an internal grievance process before resigning. *Id.* In the *Boze* case, the grievance process had already been initiated and the employee removed from probation, but the employee still resigned. *Id.* Further, SwRI's statement that the Fifth Circuit in *Boze* affirmed summary judgement "where the employee had options other than resigning" (*see* Def.'s Mot., p. 14). is misleading and overly broad. What the Fifth Circuit actually held in that case was that "[a] reasonable employee dissatisfied with his performance evaluation would have pursued [the employer's] grievance procedures." *Id.* at 804.

In the instant matter, Sari allegedly had an "Open Door" policy that would enable a Center employee to bring grievances to their Element Manger, then to the President of the Center. However, SwRI's policy did not contemplate Browning going directly to HR to grieve her unequal pay situation. Ex. 68, Magaro dep. 14:13-24. And when Browning attempted to resolve her unequal pay concerns with her superiors, Center management slammed the Open Door in her face and retaliated. When Browning attempted to grieve the fact that she was being paid less than the men, Pearcy told her she was crazy. Ex. 62, Browning dep.243:13-20. When she tried again in 2002, to grieve her concerns about salary disparity, Pearcy pointed to the door and told her if she did not like the treatment, "There's the door." Ex. 50. In February 2003, when Browning attempted to raise concerns about possible ethics violations, Pearcy dismissed her, telling her to seek psychiatric help. Ex.50; Ex. 62, Browning dep. 175-76. Patrick clearly indicated that the "Open Door" was shut to Browning. He threatened to terminate her after she complained in her performance evaluation of disparate pay and suggested that the Center's practices warranted scrutiny. Ex. 48 ¶ 8, Ex. 52 Finally, anything Browning stated during these supposed Open Door meetings could show up on her next performance evaluation as a "gratuitous, negative comment," providing the Center ammunition

to justify its "downward trending" performance ratings of Browning.  Ex. 64, Sagar dep. 81:10-82:13.  With repercussions like these, Browning had no viable grievance process and no alternative to resignation.  Accordingly, Sari has failed to meet its summary judgment burden and the Court should deny its motion.

**2.      Fact Issues Exist Regarding Browning's Retaliation Claim**

**a.      Plaintiff has Properly Exhausted Her Administrative Remedies with Regard to the Claims She is Pursuing.**

As a threshold matter, SwRI's contend that Browning failed to exhaust her administrative remedies with respect to her retaliation claim.  This argument is without merit.  Citing a Fourth Circuit opinion, Sari argues that Browning did not exhaust her administrative remedies because she failed to check the "retaliation" box on her EEOC charge.  *See* Def's Mo., p. 20-21.  However, the Fifth Circuit has held that failure to "check the box" is "a mere technical defect or omission" that does not bar Browning's claim under Title VII.  *Sanchez v. Standard Brand*, 431 F.2d 455, 461 (5th Cir. 1970); *Wong v. SBC Yellow Pages*, No. Civ. A. SA03CA0772FBNN, 2005 WL 1293717, at *8 (W.D. Tex. May 31, 2005).    "[T]he crucial element of a charge of discrimination is the factual statement contained therein.  Everything else entered on the form is, in essence, a mere amplification of the factual allegations." *Id.*  Holding that "it is inconceivable" that a charging party's rights should be cut off for failing the check a box, the Fifth Circuit also noted that it is irrelevant whether the particular plaintiff is educated or uneducated – "no one . . . should be boxed out." *Id.*

Here, Browning's factual statements on the Charge clearly articulate a claim for retaliation: "After I complained several times of [discrimination], I was subjected to a hostile work environment. . . ." Ex.. 2.  A claim of retaliation does not get any simpler than that.  Regardless of whether the EEOC investigated the retaliation claim, a Title VII cause of action is "limited only by the scope of

the EEOC investigation that could reasonably be expected to grow out of the initial charge of discrimination."[12]  *Fine v. GAP Chem. Corp.,* 995 F.2d 576, 578 (5th Cir. 1993).  Further, "the administrative charge must be viewed in its broadest reasonable sense.  *Clayton v. Rumsfeld*, 106 Fed. Appx. 268, 271 (5th Cir. 2004) (citing *Sanchez*, 431 F.2d at 462).  An EEOC investigation into retaliation could reasonably be expected to grow out of the factual statement that "After I complained several times of [discrimination], I was subjected to a hostile work environment."

> ### b.  The Effect of *Burlington Northern* on the Court's Analysis of Browning's Retaliation Claim

Just two months ago, the United States Supreme Court unanimously held that the anti-retaliation provision of Title VII does not require a showing that the employee suffered an "ultimate employment decision."  *Burlington Northern & Santa Fe RR Co v. White*, 126 S. Ct. 2405 (June 22, 2006).  The *Burlington Northern* opinion overruled the Fifth Circuit standard that the adverse action must be an ultimate employment action such as discharge, demotion, refusal to hire or refusal to promote.  *Id.* at 2414.  In so holding, the Supreme Court noted that "Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids."  *Id.* (citing 42 U.S.C. § 2000e-3(a)).  "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses.  'Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances.'"*Id.* (citing *Mtichell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)).

The Supreme Court held that in order to meet the adverse action element of the claim, "a

---

[12] The applicable case law does not require, as SwRI suggests, that the EEOC actually investigate the claim in order for a plaintiff to exhaust her administrative remedies.  It is sufficient that such an investigation "could reasonably be expected to grow out of" the Charge.  *Fine*, 995 F.2d at 578.

plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning that <u>the employer's action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"</u> *Id.* at 2415. (emphasis added). The Supreme Court goes on to note that "the significance of any given act of retaliation will often depend upon the particular circumstances. <u>Context matters</u>. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* (emphasis added). Further, the majority held that the "materially adverse" standard "does *not* require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge. (emphasis in original, internal quotes omitted).

### c.   Browning Has Produced Evidence of Retaliation

Turning to the merits of Browning's retaliation claim, in its brief, Sari identified the proper standard for a *prima facie* showing of retaliation. However, Sari abjectly ignores the substantial and compelling evidence of its retaliation against Browning and fails to address that its contradictory conduct toward Browning reveals pretext. Sari also fails to adequately address the new standard set forth by the Supreme Court in *White v. Burlington Northern*, leaving out key considerations the Court took into account when defining "materially adverse" action. Finally, Sari strenuously argues that Browning's assertions lack <u>credence</u>, which only serves to underscore the fact that genuine issues of material fact exist and requiring a jury to hear the evidence and weigh its credibility.

### I.   *Browning has established a* prima facie *case of retaliation*

#### (a)   Browning engaged in protected activity

Browning engaged in protected activity when she complained to Pearcy, and via her performance evaluation to Sagar, Patrick and the Managers Group that Sari was paying her less than her peers. In its motion Sari takes issue with the fact that Browning did not explicitly state she was

being paid less than male colleagues.  However, when Browning stated in January 2002, "I am being under compensated . . . relative to my peers" Ex. 38.  Browning was the only Research Scientist in the Center at that time – all others at the Research Scientist level and above were men.  Ex. 43, Ex. 48 ¶ 9.  Additionally, Browning brought Pearcy an ACS salary survey and showed him how females consistently earned less than men.  Browning directly asked Pearcy whether the same thing were happening to her at Sari.  Ex. 62, Browning dep. 243:13-20

When Browning again requested a salary adjustment that would bring her up to the pay level of her peers in January 2003, she was still the only female Research Scientist employed in the Center.  Ex. 43, Ex. 48 ¶ 9.  All other scientists in the Center employed at the SE-2 level and above were men.  *Id.*  Browning's 2004 request for salary adjustment was again made in the context of all male peers.  *Id.*  When Browning stated "relative to my peers," she did not need to announce that it was her male peers to whom she referred <u>because all the Center's scientists at Browning's level and above **were male**</u>.

SwRI's contention that Browning did not engage in protected activity because Browning did not mention that all her peers were male is not supported by law.  "An employee need not employ . . . any magic words such as discrimination." *Carter-Obayuwana v. v. Howard Univ.*, 764 A.2d 779, 791, 84 F.E.P. 1365 (D.C. 2001) (examining whether plaintiff opposed discriminatory practice under Title VII) (internal quotations omitted).  "[T]he communication of a complaint of unlawful discrimination . . . may be *inferred* or *implied* from the surrounding facts." *Id.* (emphasis in original, internal quotations omitted).  In this case, the surrounding facts reveal that all the other Research Scientists, Senior Research Scientist and all higher-level Scientists, were male.  For Sari to assert that it did not know Browning was complaining of being paid less than the men is singularly astonishing and an act of willful blindness.  The evidence shows that Browning engaged in protected

activity.  Ex. 38-41; Ex. 62, Browning dep. 243:13-20.

<u>(b)</u>   <u>Sari took adverse action against Browning</u>

The adverse actions Sari took against Browning are described at length in Section IV.B.1.

*infra.*  Any of these actions and, in particular, the combined affect of them would dissuade a

reasonable worker from making or supporting a charge of discrimination.  Singly and combined,

SwRI's retaliatory actions toward Browning fall squarely under the adverse action standard recently

set forth by the Supreme Court in *White v. Burlington Northern.*  A particularly striking piece of

evidence is Patrick's threat to Browning's job.  Having the President of the entire Center, who was

two levels of management up from Browning's Element Manger, threaten her in this way would

dissuade a reasonable worker from making or supporting her charge of discrimination.  *See White*,

126 S.Ct. at 2415.  But that was not all.  Browning had to fend off unsupported allegations regarding

her performance and adherence to policies, deal with continuing harassment and badgering from her

supervisor.  She also experienced the loss of two key job responsibilities and the knowledge that the

Center was trying to replace her.  Plus, Browning's very constructive discharge, the ultimate adverse

action, shows that Sari took materially adverse action against Browning.

<u>(c)</u>   <u>A Causal Connection Exists Between the Protected Activity<br>and the Adverse Actions</u>

Browning need not prove that her protected activity was the sole factor motivating SwRI's

challenged actions in order to establish the 'causal link' element of a *prima facie* case.  *Long v.*

*Eastfield Coll.*, 88 F.3d 300, 305n.5 (5th Cir. 1996).  However, Browning must show that Sari had

knowledge of her protected activity.  *See Chaney v. New Orleans Pub. Fac. Mgmt.,Inc.*, 179 F.3d

164, 168 (5th Cir. 1999).  Because Browning published her wage inequality complaint on her

performance self-evaluations and Pearcy included it on her final evaluations, all Element Managers,

Directors, Technical Director Sagar and President Patrick knew about Browning's wage disparity complaint. These decision-makers' testimony also evidences the fact that they were aware of Browning's complaints. *See e.g.,* Ex. 64, Sagar dep., 75:16-20, 82:19-23.

Whether Sari followed its typical policies and procedures when taking materially adverse action against Browning can also establish a causal connection. *Nowlin v. RTC*, 33 F.3d 498, 507-08 (5th Cir. 1994). The evidence reveals that Pearcy removed Browning from her leadership role (which he characterized as a "Principal Investigator" role Ex. 7, 11, Sari 857), he did not follow the usual procedure of conferring with the Directors and other Element Managers first. Instead, he skipped that step and proceeded decision directly to Sagar for approval.

Also, a close temporal proximity between the protected conduct and the materially adverse actions can satisfy the causal connection prong of the *prima facie* retaliation case. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). Browning history's of challenging the gender pay disparity is particularly relevant to this element of Browning's retaliation claim. *See Cortes*, 977 F.2d at 199-200. Considered in context of the particular circumstances of this case, and the relationships in the Center, SwRI's conduct throughout the last seventeen months of Browning's employment reflects a concerted and conscious effort by Center Management to force Browning to resign, and a continuing violation of § 2000e-3(a). *See Lowery v. Carrier Corp.*, 953 F. Supp. 151, 157-158 (E.D. Tex. 1997) (citing *Waltman v. Int'l Paper Co.*, 875 F.2d at 474). Patrick's threat of termination followed on the heels of Browning's salary disparity complaint in January 2003. SwRI's retaliatory actions snowballed from there – all in a (successful) effort to cause Browning to resign.

    *ii. SwRI's Alleged Non-discriminatory reasons*

For the reason that Sari ignores the vast majority of its materially adverse actions, Sari fails to articulate <u>any</u> legitimate, non-discriminatory reasons for its actions. Def.'s Mot., pp. 44-45.

Although SwRI's brief alludes to its "numerous legitimate, non-discriminatory reasons for its employment decisions" (*id.* at 45), it does not describe <u>any</u> such reasons so as to inform Browning or allow her to respond.

       *iii.*     *Step three of the* McDonnell Douglas *framework: pretext*

Had Sari articulated <u>what</u> legitimate, non-discriminatory reasons it had for its retaliatory actions, Sari would still fail to meet its summary judgment burden because Browning can demonstrate pretext. The "but for" standard for demonstrating pretext in a retaliation claim is not, as Sari seems to suggest, the same as the tort action "but for" standard. Rather, it simply means that an adverse action is not retaliatory if the employer would have made the decision regardless of the employee's protected activity. *Wong v. SBC Yellow Pages*, SA03CA0772FBNN, 2005 WL 1293717, at \*8. In the instant case the retaliatory conduct was not one simple employment decision, but a concerted and sustained series of actions meant to punish Browning for daring to speak up about her unequal pay. Browning's evidence of pretext would overcome SwRI's legitimate reasons, had it articulated any.

          <u>a)</u>    <u>Evidence of Defendant's disregard of its own procedure creates genuine issues of material fact regarding pretext</u>

Sari alleges that it periodically rotates the lead of the Center's ISI leads and that Browning's removal from the Q&C ISI lead was just one such example. However, SwRI's disregard for its own procedure in the Center creates a material issue of genuine fact regarding the falsity of SwRI's explanation and indicates that Browning's gender was a motivating factor in Pearcy's decision. Pearcy testified that the usual procedure for removing a Center employee from an ISI lead was for him to meet with other Element Managers and Center Directors in a group, in much the same fashion as the Managers Group meets to discuss performance evaluations. Ex. 63, Pearcy dep. 158:19-160:6.

After reaching consensus in the Mangers Group, Pearcy would get approval from Sagar and Patrick before effecting the change. *Id.* 160:3-9. In Browning's case, Pearcy admitted that he removed Browning from the Q&C ISI lead without following this ususal procedure. Instead, after receiving complaints about Browning from Pabalan (*id.* 155:9-11),[13] Pearcy made the decision to remove Browning from the Q&C ISI lead. *Id.* 154:12-15. The fact that Pearcy, who was so keen to catch Browning in any deviation from ordinary procedure, totally bypassed a significant step in the usual process of changing ISI leads indicates that the reason Sari gave for Browning's removal from the ISI lead is not worthy of credence, and is therefore probative of intentional discrimination. *See Reeves*, 530 U.S. [147-78].

<ol type="b"><li>Evidence regarding falsity and shifting nature of Defendant's explanation for removing Browning from leadership positions creates genuine issues of material fact regarding pretext.</li></ol>

The trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. *Id.* Here, Pearcy explained to Browning and Sari continues to insist in this litigation that Browning was removed from the ISI lead for performance reasons, including the assertion that Browning's work "lacked technical rigor." Ex. 41, Sari 733. Yet, the truth was that Center Management and the client, the NRC, believed Browning's work to be first rate. The same evaluation that criticizes Browning's work for lack of technical rigor, also states that "Lauren's work leading the technical review . . . has been commended by the NRC [client's] technical leader. Dr. Browning was also named to a technical committee for NASA . . . .". *Id.* And at his deposition Pearcy testified that Browning's technical work "continued to be good". Ex. 63, Pearcy dep. 161:11. The evidence reveals that SwRI's reason for removing Browning from her leadership roles is false. From this, a trier of fact can infer guilt. SwRI's false stated

---

[13] Pabalan's discriminatory animus toward Browning is documented above in Section III.[G].

reasons create genuine issues of fact regarding pretext and motivating factor.

> c)   Evidence that reason given for removing Browning from leadership positions was not stated on performance evaluation given just weeks earlier creates genuine issues of material fact regarding pretext.

On January 30, 2004, Pearcy telephoned Browning to inform her that she was being removed from her role as Primary Investigator of the Q&C ISI. Ex. 63, Pearcy dep. 169:5-11, Ex. 48 ¶ 10, Ex. 56. And in fact, he made his decision to do so weeks before Browning's performance evaluation was completed on January 29, 2004. Ex. 40, Ex. 64, Sagar dep. 103:11-15. His stated reason for removing Browning from the Q&C ISI lead was performance based. Ex. 63, Pearcy dep. 154:16-155:17. However, Pearcy admits he did not speak to Browning about her leadership role being in jeopardy at any time before he made the decision to strip her of this significant job responsibility. *Id.* 157:11-14. More remarkably, nowhere in Browning's January 29, 2004 performance evaluation does Pearcy, or any other Center Management member, mention that Browning's performance in the area of the Q&C ISI was suffering, or that he doubted in her ability to continue effectively in the role. Ex. 41, Sari 733). Such an omission raises issues of pretext and motivating factor, which must be determined by a jury. *See Stewart v. Peat, Marwick, Mitchell & Co.*, 52 F.E.P. 445, at *9-10 (S.D.N.Y. 1989).

> d)   SwRI's changing story about why Browning was removed from the Q&C ISI lead creates genuine issues of material fact regarding pretext.

Sari maintains conflicting positions on why Center Management removed Browning from her role as technical lead for the Q&C ISI. Initially, Pearcy contended that Browning was removed for performance reasons. Ex. 62, Pearcy dep. 154: 16-22, Sari 857. Now, in this lawsuit, Sari asserts for the first time that Browning's removal from the ISI lead was merely part of the Center's routine

rotation of employees into and out of such positions. Def.'s Mot., p. 42.[14] But contemporaneous with

Pearcy told Browning over the phone that he was removing her from the ISI lead, he also told her

that she "talk[ed] too much" and took too much credit for work on the ISI. Ex. 56. And a year-and-

a-half after that, SwRI told the EEOC that Browning was removed from the ISI lead "to

accommodate <u>her request</u> to work on space sciences instead." Ex. 3, EEOC 368 (emphasis added).

SwRI's inconsistent explanations raise credibility issues concerning pretext and motivating factor,

which must be weighed by a jury. Therefore, summary judgment is not appropriate.

> e)  Evidence that male Research Scientists and Senior Research
> Scientists did not have their performance ratings downgraded
> for similar alleged infractions creates genuine issues of
> material fact regarding pretext.

Based on Pearcy's presentation of annual Browning's performance, the Managers Group

downgraded Browning's performance ratings from "Exceeds Expectations" to "Meets Expectations

(-)" based on attitude, specifically perceived lack of a "can do" attitude, alleged "gratuitous

derogatory comments." Ex. 39. Yet, a male employee who exhibited inadequacies in his direct

dealings with others and whose insensitivity or arrogance caused his Element Manager to describe

him as "creat[ing] the perception that he is the single oracle-like source of . . . knowledge," received

"Exceeds Expectations" and "Exceeds Expectations - Plus." Ex. 17, 2nd RFP Sari 610, 617. That

Sari gave inconsistent weight to interpersonal issues in the performance evaluations creates genuine

issues of material fact regarding pretext.

---

[14]  Further, SwRI incorrectly implies that Browning admitted that she was aware of other employees being
removed from an ISI lead. *Id.* Rather, Browning testified that other employees sometime took on or left a lead position,
not that any of them were removed against their wishes by Center Management. Ex. 62, Browning dep. 226: 6-22

<u>f)</u>    Evidence of SwRI's dissembling to cover up a discriminatory purpose creates genuine issues of material fact regarding pretext.

At deposition, SwRI's witnesses gave conflicting testimony with respect to whether Browning had provided Pearcy with an ACS salary survey at the time she made one of her pay disparity complaints.  Pearcy denied that Browning had given him the survey.  Ex. 63, Pearcy dep. 116:22-117:1 However, Sagar testified the Browning had provided Pearcy with a survey.  Ex. 64, Sagar dep. 82:19-23.  Sari denies that Browning ever mentioned gender as the basis of her salary complaints.  Browning's direct question to Pearcy about "whether this [female scientists consistently earning less than male scientists is happening to me" was made in reference to the ACS salary survey.  Ex. 49; Ex. 62, Browning dep. 243:13-20.  SwRI's dishonesty about whether Browning presented the salary survey to Pearcy is evidence of SwRI's dissembling to cover up a discriminatory purpose.  A jury is entitled to consider SwRI's dishonesty as affirmative evidence of guilt.  Thus, summary judgment is inappropriate.

<u>g)</u>    Evidence that Pearcy kept a secret paper trail on Browning creates genuine issues of material fact regarding pretext

As described in Sections III. I. and IV.B.1.a.*vi, supra,* Pearcy heavily documented his interactions with and observations about Browning, which he kept in a file in his office, separate from Browning's official personnel file.  He kept these notations and memoranda without informing Browning that he was doing so.  Such actions can lead to an inference of pretext.  *See Harris v. Richards Mfg. Co.*, 511 F.Supp. 1193 (6th Cir. 1982) reversed in part on other grounds, 675 F.2d 811 (6th Cir. 1982).   **3.    Defendant's Motion for Summary Judgment as to Browning's Discrimination Claim for Failure to Promote Should Be Denied.**

Sari states the proper standard for a *prima facie* case of discrimination for failure to promote.  However, Sari completely ignores the evidence that establishes element four of Browning's *prima*

*facie* case – that Sari was seeking outside applicants with Browning's qualifications for a Senior Research Scientist position in the Geochemistry element of the Center. Also, instead of referring to its own published qualifications for promotion to Senior Research Scientist, Sari relies on the subjective opinions of David Pickett – who is not a member of the Center Management and has never been in the position to recommend a subordinate for promotion to Senior Research Scientist – to establish the "expectations" of a Senior Research Scientist. Finally, Sari fails to address that its contradictory behavior reveals pretext.

      **b.**    **Browning Has Produced Circumstantial Evidence of Discrimination**

            *I.*    *Browning has established a* prima facie *case of discrimination*

In employment discrimination cases, a Plaintiff can choose to present his or her case by direct or circumstantial evidence (or both). *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 222 (5th Cir. 2000). In *Russell*, the court noted: "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled. *Id.*

Sari acknowledges and does not dispute that Browning is a member of the protected class (female) and that Sari never promoted her to Senior Research Scientist. Def.'s Mot., p. 32. However, Sari contends that Browning cannot meet the other two elements of her *prima facie* case. As the evidence, arguments and authorities below demonstrate, Browning can establish a *prima facie* case of gender discrimination.

            <u>a)</u>    <u>Element two:  Browning sought and was qualified for the Senior Research Scientist position.</u>

Sari does not dispute that Browning sought the promotion. Rather, its challenge to element two of Browning's *prima facie* case goes to her qualifications. In a nutshell Sari argues that because the Center's Managers Group did not rate Browning "Clearly Outstanding" on her performance

evaluations, she was not eligible for promotion, ergo, Browning was not "qualified" and could not

have suffered an adverse employment action, and therefore can not make a *prima facie* case. SwRI's

argument confuses its subjective criteria for "eligibility" with the real and actual qualifications to

hold and perform the job. The evidence shows that <u>Browning was qualified for and performing the

work</u> of a Senior Research Scientist, despite the subjective performance ratings the Center gave her.

Ex. 63, Pearcy dep. 86:15-21, 87:1-5, 106:10-16, 122:19-123:7, 124:10-125:23, 148:25-149:1,

150:2-151:2. Further, the evidence shows that the Center's Management Team applied the standards

for promotion (i.e, receiving two "Clearly Outstanding" performance ratings) more strictly to

Browning that it did to her male colleagues. Because Sari could (and did) manipulate whether

Browning was "eligible" for promotion, it is disingenuous for Sari to argue Browning was not

qualified.

Courts in this circuit have recognized that while an employer may rely upon subjective

criteria in terms of qualifications, such subjective criteria also provide opportunities for unlawful

discrimination because the criteria itself may be pretext for discrimination. *Medina v. Ramsey Steel

Co., Inc.*, 238 F. 3d 674, 681 (5th Cir. 2001). Accordingly, contrary to SwRI's reading of *Medina*,

subjective criteria (which could also be evidence of pretext) should not be used to defeat the

employee's *prima facie* case. *Id.* In the *Medina* case, the employer tried to contend that *Medina's

prima facie* case was defeated because he was not qualified under the criteria that the position

required "substantial sales experience." Because this hiring criteria was entirely subjective, the court

concluded that *Medina's* claims could not be defeated on summary judgment at the *prima facie* case

stage. The justification for this was to preclude the judge from making credibility determinations

in a summary judgment context. *Id.*

Additionally, the Fifth Circuit has held that employers who make promotion decisions based